Daniel G. Davis
State Bar No. 56845
9454 Wilshire Boulevard, Penthouse
Beverly Hills, CA 90212
310.659.5800
310.858.7263 - fax
Email: joni4word@aol.com

Attorney for Defendant
RONALD GERARD BOYAJIAN

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 09-933-CAS |
| Plaintiff, | DEFENSE MOTION TO SUPPRESS EVIDENCE RESULTING FROM UNLAWFUL SEARCHES AND SEIZURES |
| vs. | |
| RONALD GERARD BOYAJIAN, | |
| Defendant. | Hearing Date:    January 10, 2011 |
| | Hearing Time:   1:00 p.m. |

TO THE COURT AND RESPONSIBLE UNITED STATES ATTORNEYS:

Please take notice that, on January 10, 2011, at 1:00 p.m., or as soon thereafter as counsel may be heard, defendant, Ronald Boyajian, will move this Court for an order suppressing all evidence obtained as a result of illegal searches and seizures of defendant's property, most particularly his digital media equipment. The initial searches in question were conducted without search warrant or compliance with Cambodian law; and subsequent searches and seizures of defendant's digital media equipment, after coming into sole possession and control of United States law enforcement, were then again illegally searched and seized, without search warrant.

This motion is made pursuant to the Fourth Amendment of the United States Constitution and based on the attached memorandum of points and authorities, specific references to discovery in this matter, exhibits, further pleadings and all files and records in this case, as well as on any further evidence and argument presented at hearing.

Dated: November 23, 2010                    Respectfully submitted,

_____
DANIEL G. DAVIS
Attorney for Defendant

**1.     Introduction.**

On September 15, 2009, the Grand Jury filed an indictment against defendant Ronald Boyajian alleging that he engaged in sexual conduct in Cambodia with a girl who was under the age of 18, sometime between September 7, 2008 and on or about February 19, 2009. The girl has been nominated for purposes of these proceedings as "S.L." and is the sole complaining witness or victim within the charges in this case against Mr. Boyajian brought pursuant to Title 18, United States Code, Section 2423(f). While in the midst of defending himself in a Cambodian court in Phnom Penh, defendant was removed to the Central District of California on or about August 31, 2009. It is further alleged that defendant previously suffered a conviction in California for what is nominally known as "statutory rape," some fifteen (15) years beforehand, pursuant to California Penal Code Sections 261.5 and 288a(b)(1).

The items seized and searched by law enforcement in this case, that are the subject of this Motion to Suppress, may be generally referred to in this motion as "Digital Media Equipment" (DME) and are specifically the following:

1.     One 100 GB Fujitsu hard drive (serial number NW69T6526CTJ) inside an Apple Macbook Pro laptop. Silver in color (serial number W86250K5VWX);

2.     One Western Digital External hard drive, black in color (S/N: WXH308955009);

3.     One 8GB Transcend memory card (S/N: 214085-0763) found within the Canon camera;

4.     One black Micro SD 4 gigabyte memory card that fits inside a telephone or can be used with an adapter to fit inside larger media;

5.     One compact disc with the image of a tiger containing the title "WORLDBOOK 2007 Edition Installer CD 1";

6.     One compact disc with the image of a tiger containing the titled "WORLDBOOK 2007 Edition Installer CD 2";

7.     One compact disc, orange in color, with the manufacturer name "Princo";

8.     One compact disc depicting the image of a palm tree and ocean. Written in black marker is "Rosettta Stone English US I + II Thai I Vietnamese I";

9.     One compact disc, white in color, with the manufacturer name "Princo." Written in blue marker is "Final Cut Studio 2";

10.    One compact disc, white in color, labeled "Mac OS X Leopard 10.5";

11.    One compact disc, white in color, with the manufacturer name "Princo"; Written in black marker over the manufacturer's name is "4WWHW-TYTK4-HTYBW-DDDG8-MFYJB." Written in black marker below is "XPsy2";

12.    One Canon 10 MP digital camera (S/N: 3248106160);

13.    One Nokia camera phone, model N95, silver and purple in color (code number: 0553842); and

14.    One Seagate hard drive, sn 9QJ1VE8B.(984-85) (1023)

Statements in this pleading are frequently referenced to parenthetical numbers that identify evidence or documents received by the defense from the government by way of informal discovery. It is more likely than not, that, even after efforts by counsel to eliminate the need, live testimony in an evidentiary hearing may be required. After the government has filed its opposition, counsel will confer and attempt to resolve that question.

**2.     The Essential Cooperative Nature Between the United States and Cambodia in Prosecuting International Child Sex Crimes is Broad and Historic.**

The nature and extent to which the investigation, surveillance, arrest and transfer of defendant Ronald Boyajian and his evidence from Cambodia to the United States should be evaluated in its historic and broad background of cooperation between the United States, the Cambodian government and organizations and agents that work with them. Ronald Boyajian was arrested on February 19, 2009. Long before and since, the joint cooperation affecting his

Defense Motion to Suppress Evidence

prosecution had been firmly established.  Legislation had been enacted that focused on crimes committed by American citizens in foreign countries.  The Department of State and its Embassy offices in cities like Bangkok, Thailand, and Phnom Penh, Cambodia, began actively implementing international focus and prosecution of American citizens accused of child sexual abuse in Cambodia.  Public statements, publications and formal position papers document the historic cooperation involved.  The agencies involved have publicly confirmed the essential "joint operation" of the original investigation, arrest and prosecution in Boyajian's case.

For example, the United States Embassy on June 29, 2007, published in its own "Program & Events," description of how supervisory Cambodian National Police traveled to Roswell, New Mexico, to attend a course at the International Law Enforcement Academy "to enhance the ability of experienced law enforcement officials to combat crime in their respective countries and encourage bilateral and regional cooperation in combating transnational crime."  The objective of the four-week course, conducted in June 2007, was "to promote effective cooperation among law enforcement agencies worldwide."  The course was also intended to facilitate "cooperation with U.S. international law enforcement agencies to successfully counter transnational criminal elements."

Similarly, on June 13, 2008, the United States Embassy and the Department of State published an article in its regular "Programs & Events," entitled "U.S. Conducts Forensics Workshop for Cambodian Law Enforcement Officials."  Agents from the U.S. Naval Criminal Investigative Service (NCIS), the primary law enforcement and counter intelligence arm of the Department of Navy, traveled to Phnom Penh, Cambodia, and instructed select members of Cambodian's National Counter Terrorism Center, the Cambodian National Police and Royal Cambodian Armed Forces in "forensic science and crime scene processing for Cambodian law enforcement officials."

Not only did a wholesale level of international cooperation precede Mr. Boyajian's arrest, on February 19, 2009, but continues even more pervasively today.  Official statements

Defense Motion to Suppress Evidence

continue to confirm that joint cooperation historically existed, particularly in connection with prosecution of American citizens in Cambodia for child sexual abuse crimes.

In a letter dated July 16, 2008, the Minister of Justice of Cambodia directed Cambodian prosecutors to participate in the "leading and coordination of the investigation and sexual exploitation of Cambodian children by an American citizen." In his letter, the Minister specifically informs his prosecutors "that American law enforcement, the FBI and ICE have initiated the strategy of assisting Cambodian police in the upcoming investigation of allegations of sexual exploitation on Cambodian children by an American citizen in three provinces.... in the near future." The letter goes on to identify the "operation" in which "... the American party requests cooperation from the prosecutors... to ensure the investigation and evidence collection is done in accordance with the legal procedures of the Kingdom of Cambodia." The communication ends with a final statement fairly establishing the joint venture character of the interaction between Cambodian prosecutors and American law enforcement: "With regards to the cooperation of the American law enforcement, the American group is limited to providing information, technical equipment and strategy assistance." (563)

On March 1, 2010, the United States Embassy reported that John Morton, Assistant Secretary for Immigration & Customs Enforcement (ICE), the principal investigative component of the Department of Homeland Security, visited Phnom Penh, Cambodia, to reenforce the "strong cooperation with the Cambodian National Police over the last several years, especially in the fight against sex tourism in the country." During his visit, Morton signed a new letter of intent designed "to increase training and cooperation between the two investigative bodies, "CNP and ICE." The Embassy statement noted that the Department of Homeland Security operated on "an annual budget of more than $5 billion dollars."

On March 2, 2010, a local Phnom Penh newspaper, the "Cambodia Daily," published an article entitled "U.S., Cambodia signed letter to further anti-sex crime cooperation." The article announced that on the previous day, Monday, March 1, 2010, the Cambodian

government and the United States signed a letter of intent to "strengthen cooperation between the two nations in preventing and punishing child sex crimes."  The announcement was formerly made by John Morton in a news conference at the U.S. Embassy in Phnom Penh. Morton heads the investigative arm of Homeland Security, which was created in 2002, after the September 11, 2001 terrorist attacks in New York City.  In his announcement, Morton confirmed the historic cooperative relationship between Cambodian and American law enforcement: "The letter of intent is designed to *strengthen the existing cooperation, to add to the investigations we already do* and create a lasting, coordinated, intelligence driven bilateral cooperation on these areas of concern." The newspaper article specifically referenced Ronald Boyajian's arrest:  "Perhaps most notably, three child sex tourists were shipped back to the U.S. in October under a joint Cambodian-U.S. program known as 'Operation Twisted Traveler.'"

On August 21, 2009, Theodore Allegra, Deputy Chief for the United States Embassy in Phnom Penh, Cambodia, wrote a letter to Prime Minister Hun Sen of the Cambodian government, thanking him for his "support during your meeting with United States Senator Jim Webb and Ambassador Carol A. Rodley, on August 18, 2009, in sending three American citizens to face prosecution in the United States, referring to Ronald Boyajian, Erik Peeters and Jack Sporich.  The letter further confirmed cooperation at the highest level and confirmed that ICE agents would be arriving on August 26, 2009, to transport the three men to Los Angeles, California, "to face prosecution for violations of the United States Protect Act." (1832-33)

United States Attorney's office for the Central District of California also confirmed the essential cooperative nature of the Boyajian arrest, in a press release, on August 31, 2009.  The government stated that the Boyajian's arrest was "the result of our Operation Twisted Traveler, an ongoing effort by the Department of Justice and U.S. Immigration & Customs Enforcement (ICE) to identify and prosecute sex tourists who travel to Cambodia to engage in illicit sex with children."

*       *       *

The Twisted Traveler cases are the result of information provided to ICE by investigators for Action Pour Les Enfants (APLE), a non-governmental organization (NGO), established to combat sexual exploitation, and International Justice Mission (IJM), a human rights agency....

The statement emphasized that, "The child sex tourism cases announced today are the direct result of the *unprecedented cooperation* among U.S. authorities, such as the FBI and the Department of State, the Cambodian government and NGO's...."  "Operation Twisted Traveler" was described as "a collaborative investigative effort coordinated by ICE's Office of International Affairs," involving their offices in Bangkok and Los Angeles.  The release further explained that, "As part of Operation Twisted Traveler, ICE and FBI agents jointly conducted training for organizations in Cambodia involved in the effort to combat child sex tourism, including representatives from the CNP, local Cambodian law enforcement and several NGO's."  Bearing directly on the legal subject of a "joint operation," the government added that, "The training covered all aspects of child sex tourism investigations, ranging from search and seizure procedures and surveillance techniques...."

The next day, on September 1, 2009, the Washington Post published an article entitled "Three Americans Face Child-Sex Charges," in which Virginia Kice, spokesperson for ICE, succinctly characterized the level of cooperation among U.S. and Cambodian authorities and non-governmental organizations (NGO): "This level of cooperation is unprecedented."  U.S. officials announced that "Twisted Traveler," launched in October 2008, involved training of Cambodian National Police and local police in Phnom Penh by the FBI and ICE.

Although the description "Non-Governmental Organization" (NGO) suggests that they are somewhat independent and apart from law enforcement operations, in Mr. Boyajian's case, such is not the reality.  Action Pour Les Enfants (APLE) worked very actively, particularly through an undercover operative, Isaac Veth, to assist and respond primarily to ICE agent

needs, in setting up and securing the arrest of Ronald Boyajian, as well as locating and securing his digital media equipment (DME). Many of the specific details of Mr. Veth's role are yet to be determined. Nonetheless, existing information establishes that, as an undercover agent, Isaac Veth was actively involved in APLE's coordinated activities with the Cambodian National Police (CNP), special agents with United States Embassy in Cambodia and ICE agents in Phnom Penh, Cambodia, Bangkok, Thailand and Los Angeles, California.

**3.     Los Angeles and Cambodian ICE Agents Targeted Boyajian for Sex Tourism Arrest in a Month-Long Undercover Joint Operation with the United States Embassy, CNP and APLE Agents.**

ICE Agent Jonathan Ruiz and his colleagues, Supervisor Perry Woo and others, published and reported "ICE Significant Incident Reports" on May 12, 2009 and September 1, 2009, in connection with the arrest of Ronald Boyajian. (896-99)   ICE Agent Ruiz, in his report, revealed that his agency was involved in a "certified undercover operation," nominated "Operation Twisted Traveler," that targeted United States child-sex tourists in Cambodia. Based on surveillance reports of NGO and APLE, Los Angeles ICE agents and agents from Bangkok, Thailand, conducted a "month-long undercover" surveillance of Boyajian, largely during the month of February 2009. (898)

In another report, authorized by ICE Agent Neal Burdick, he revealed that "Twisted Traveler" was an operation "being conducted with the assistance of" ICE Bangkok, Thailand; ICE Tokyo, Japan; and the office of International Affairs for ICE, as well as the United States Attorney's Office in Los Angeles; the U.S. Embassy in Cambodia and the ICE Cyber Crime Center. (896)   In one incident report generated by ICE Agent Jonathan Ruiz, the arrest of Ronald Boyajian was reported, in part, as follows:

On February 19, 2009, attache Bangkok and SAC Los Angeles agents, in conjunction of a *joint operation* assisted the Cambodian National Police (CNP) in the arrest of Ronald Gerard Boyajian at a child brothel in Cambodia.

*     *     *

This enforcement action is a direct result of ICE's investigative support and coordination of information from two non-governmental organizations: International Justice Mission (IJM) and Action Pour Les Enfants (APLE) that were utilized by the CNP.

(1580)

In his affidavit in support of an arrest warrant for Boyajian, Ruiz detailed how ICE has had "formal agreements" with APLE, who in turn has agreements with the Foreign Ministry of Cambodia and the CNP.  Actually, there is documentary evidence that ICE and APLE were aware of Boyajian and surveilling him more than a year before his arrest. (1433-36)  In 2008, APLE was surveilling and informing on Boyajian when he was in Cambodia, until he returned to the United States.  Beginning in January 2009, Isaac Veth, an undercover agent networking between APLE and ICE began to associate with Boyajian for purposes of  building a sex tourism case against him.  He was informed by ICE that Boyajian had suffered a prior conviction in the United States for having sex with a minor.

Isaac Veth worked closely with Sous Vansak, who is attached to the U.S. Embassy in Phnom Penh, Cambodia, variously described as a "Regional Safety Officer" and an ICE "Foreign Service National."  Sous Vansak coordinated all of the interests in Phnom Penh for Operation Twisted Traveler, including use of undercover agent Isaac Veth, direct communication with APLE and Bangkok ICE agent Nguyen Hung, as well as local police CNP.  Sous Vansak was the go-to local Cambodian for coordinating the combined law enforcement interests and NGO's in their joint effort to arrest Ronald Boyajian, as part of the federal "package" for prosecution in Los Angeles federal court.  Vansak was the most proficient local investigator and liaison for ICE's undercover operation against Boyajian.

ICE agents, including some recently shipped in for the undercover operation, outfitted Isaac Veth with a GPS device to attach to Boyajian's motor bike to better trace his local travel.

1   ICE equipped and instructed Isaac Veth on the installation and use of hidden audio and video
2   equipment that Isaac Veth used to record his conversations and contacts with Boyajian.  Veth
3   pretended to be Boyajian's Cambodian friend, initiating conversations about computers, child
4   pornography and any subject chosen to develop evidence enhancing the prosecution of
5   Boyajian.
6         On Tuesday, January 13, 2009, at 11:00 a.m., APLE Director Seila Samleang emailed
7   a request to ICE Special Investigator Sous Vansak and local ICE Agent Nguyen Hung,
8   requesting information about Boyajian, stating in part: "Hello Hung and Vansak.  Please check
9   this man if you know him.  We have good reason to believe that he's a pedophile but are
10  unable to obtain his full name yet."  The APLE director ends with "I'll get back to you later
11  when new evidence emerges." (1716)
12        Handwritten on the same document are notes memorializing information obtained from
13  Isaac Veth, dated January 13, 2009, beginning at 3:40 in the afternoon.  Veth reports to ICE
14  agent Sous Vansak that Boyajian "stays International Hotel" and claims some type of
15  interaction "with one girl since she was underage, now she is adult."  Veth also claims
16  Boyajian "had sex with girl in German case, who attempted to commit suicide by jumping to
17  ground."
18        A second note in the email contains information from Isaac Veth, dated ten days later,
19  on January 23, 2009, which corrects where Boyajian is staying: "Actually, it's International
20  Guest House," the location where Boyajian was taken, on February 16, 2009, to retrieve his
21  passport.  By February 20, 2009, to be present for the search and seizure of his personal
22  belongings, including DME, which occurred at a different location, the Tong Mean Guest
23  House.
24        This one email interconnects ICE, APLE, Sous Vansak and Isaac Veth on January 13,
25  2009, and then again on January 23, 2009, as part of a joint operation to surveil, investigate,
26  identify and accuse Ronald Boyajian of illegal sex activity in Phnom Penh, Cambodia.  On that
27
28

1   date, the Director of APLE evidently had no evidence against Boyajian, saying he would

2   contact again, "when new evidence emerges."

3         A month later, on Monday, February 13, 2009, at 7:40 in the evening, a revealing email

4   was sent by Los Angeles Supervising ICE Agent Perry N. Woo to a large contingent of agents,

5   operating in Cambodia to finesse their plans for arresting Ronald Boyajian. (1790)  The email

6   was originally sent to local ICE Agent Nguyen Hung and additional ICE agents on the ground

7   Mario San Pedro, Patrick S. Li, Kevin Panganiban, Wanda Chavas, David Sullivan and David

8   Pike.  The email from Woo to his agents in Cambodia was then forwarded by local ICE Agent

9   Nguyen to Special Investigating Agent Sous Vansak.  It provides biographical information on

10  Ronald Boyajian,  and is simple and unequivocal about their plans for him:  "We will scoop

11  him up if we take down brothels later this week.  Perry."

12        Three days later, on February 16, 2009, Boyajian went to the China Airlines office in

13  Phnom Penh with undercover agent Isaac Veth at his side. Boyajian purchased a ticket in

14  Veth's company for a trip back to the United States on the morning of February 20, 2009.

15  Time was quickly running out to "scoop him up."  Veth passed the word on to ICE and APLE;

16  and APLE's Agent Houn Tim contacted local traffic enforcement police who stopped

17  Boyajian on his motor bike and demanded identification. Isaac Veth faded back out of the

18  scene.  Although Boyajian displayed a China Airlines ticket that clearly set out his full name

19  and other identification information, police insisted on seeing his passport and escorted him

20  back to his room at the International Guest House, where he produced his passport. (137)

21        Later that day, ICE agents fitted undercover agent Isaac Veth with concealed tape

22  recorder for purposes of memorializing anticipated incriminating statements.  On those tape

23  recordings, an ICE agent can be overheard testing the audio equipment, and instructing Isaac

24  Veth on how to operate it: "So, pretend you are walking to the UC (undercover) meet right

25  now."  When Veth has difficulty operating the equipment, the ICE agent instructed, "Just

26  record the whole time, okay."

27

28

Later that day, Isaac Veth reconnects with Boyajian and he can be heard talking about the traffic stop. Veth plainly is jerking Boyajian around. Veth had already provided Boyajian's address to ICE and APLE. He was riding with Boyajian, when the traffic stop occurred. Yet he pretended that the stop was randomly associated with someone, who "ran into your moto." Boyajian reasoned that it was a police officer who stopped him, and "actually blocked my motorcycle." "Dude, that's why they wanted your passport, to make sure you were fucking legit and shit, because you almost killed one of them, you fucker. You know." When Boyajian expresses fear that they may follow him or bring him harm, Veth assures him, "Naw, this is my fucking hood, dude." (1390-91) On the day of purchasing the China Airlines ticket, and the subsequent traffic stop, Veth continued to keep close company with Boyajian and continued to taperecord their conversations on February 16, 17 and 18, 2009.

In the week immediately preceding Boyajian's arrest, on February 19, 2009, ICE agents and Isaac Veth were busy working undercover with CNP and additional ICE agents, who had come to Phnom Penh to "scoop up" Boyajian. For example, on February 13, 2009, at approximately 5:00 in the afternoon, ICE agents Paul Carbone, Mario Sanpedro and David Sullivan accompanied Isaac Veth to Boyajian's residence at the International Guest House. An undercover meeting had been planned, and Isaac Veth was fitted with hidden audio and video camera equipment. He also had a small Global Positioning Satellite tracker (GPS) in his pocket.

While the agents waited immediately off the premises, Isaac Veth went inside the building to develop evidence against Boyajian. After a brief period of time, Isaac came out to the agents and debriefed them. He provided ICE Agent Carbone a compact disc that Veth said was a "gift" from Boyajian and suggested that it contained child pornography. (548) To date, the defense knows little more about the circumstances whereby Isaac purportedly produced a compact disc to ICE agents, much less what it actually contains.

In another ICE report for February 13, 2009, Special Agent Ruiz states that Isaac Veth "informed ICE SA David Sullivan that, on February 13, 2009, at approximately 1700 (5:00

p.m.), SOI (Isaac Veth) installed a data logging Global Positioning System (GPS) device on John's red motorcycle bike, license plate 1H7736, while it was parked at the International Guest House...."  In that report, however, Ruiz does not mention that Isaac Veth, at the same time, was involved in an undercover operation initiated by ICE Agents Carbone, Sanpedro and Sullivan.  There was no need for Isaac Veth to "inform" Sullivan about a GPS device.  The agents were all there with Isaac Veth and knew exactly what he was doing. (548, 559)  This all occurred at the same time and the same location where Isaac Veth stepped out to debrief and purportedly gave the ICE agents the "gift" containing child pornography.

The use of all the devices on Isaac Veth's person, that night of February 13, 2009, was the result of a joint operation and plan to maximize the gathering of evidence, so that the agents could shortly "scoop up" Ronald Boyajian.  On February 24, 2009, ICE Agents David Sullivan and Mario Sanpedro retrieved the same GPS device from the motor bike Boyajian had rented, memorializing the recovery in photographs taken before its actual removal.  Then, "[t]he device was downloaded and the data saved to a compact disc." (545, 559)  Isaac Veth planted the device for ICE agents, then ICE agents later retrieved the device, downloaded the information and preserved it for use against Ronald Boyajian.

On the evening of Thursday, February 19, 2009, the date scheduled for "scooping up" Ronald Boyajian, everyone was in attendance.  CNP, APLE, a multitude of ICE agents and Special Investigating Agent attached to the U.S. Embassy, Sous Vansak.  A brief review of the video taken by ICE Agent Carbone provides a fair inventory of the personnel involved.  Equipped with a video camera, Carbone announces at the beginning of his recording that, "The time is 1935 hours, standard Cambodian time.  This is going to be videotape of a *warrant* service execution over at the Svay Pak/Kilo 11 area of Phnom Penh.  This is Special Agent Carbone.  I am here with several other ICE investigators, IJM (International Justice Mission), APLE and Cambodian National Police."  As they make their way walking toward the planned arrest site, Carbone adds, "We are making our way towards the *warrant* location, through a main corridor, Kilo 11.  On scene are SA's Mario Sanpedro, David Sullivan, Hung Nguyen,

1  Perry Woo and Patrick Li." Later on he announces, "Also on the scene is Vansak Sous, ICE

2  investigator." Whereupon Vansak states, "We have a tracking device on the bike. We keep

3  track of where he goes."

4      Actually, what Carbone was referring to when he talked about a "warrant service" and

5  "the warrant location" was a subpoena that had just been issued by the CNP for Boyajian to

6  voluntarily appear at a local Cambodian investigative court, on or by March 6, 2009. As will

7  be seen, that is the procedure provided for by the Cambodian Code of Criminal Procedure,

8  Article 113, for witnesses and suspects associated with "non-flagrant" crimes, rather than an

9  Article 91 procedure, for "flagrant" crimes where an individual is caught in the act or

10 immediately fleeing from the commission of a crime.

11     Later on during the video parade, one of the ICE agents asks, "Did you get a shot of all

12 those kids, too?" To which Carbone responds, "I kind of did. I didn't want to be too

13 obnoxious about it (chuckling). There's literally hundreds of small children in here."

14     Other agencies present at the scene also made videotape record of what occurred, often

15 from different angles and points of view. The sheer variety and number of agencies and their

16 personnel establish that the investigation and arrest of Ronald Boyajian was unequivocally a

17 "joint operation," involving many agencies and agents of the United States, with multiple

18 counterparts from the Cambodian government, interchangeably using a small network of

19 special investigators and undercover operatives.

20     After Boyajian's arrest, however, ICE agents immediately took over the case, taking

21 complete possession of all evidence searched and seized, immediately setting about to

22 interview and debrief anyone who might have known Boyajian. Twice, on February 25, 2009,

23 a large contingent of joint forces interviewed some of the desk clerks from the International

24 Guest House, where Boyajian had resided. The clerks were brought to CNP headquarters,

25 Anti-Human Trafficking Division and questioned about Boyajian's day-to-day, while he

26 resided at the International Guest House. Using the power of a CNP subpoena, a contingent

27 of ICE agents, assisted by CNP Colonel Virak Yim, conducted the interview. ICE agents in

28

1    attendance included ICE Foreign Service National Investigator Vansak Sous and L.A. ICE

2    agents flown in for the event, Mario Sanpedro, Dave Sullivan and Paul Carbone. (549-56)

3          Appearances would suggest that Ronald Boyajian was a belated addition to a "package"

4    of American "sex-tourists," being gathered for public rendition to the United States for federal

5    prosecution.  Some of the same operatives involved in Boyajian's case were also involved in

6    the investigation and arrest of two other Americans arrested or charged about the same time,

7    Erik Peeters and Jack Sporich.

8          For example, that copy of Boyajian's DME made by ICE agents in Bangkok, Thailand,

9    was actually, physically combined on the same hard drive as was computer and electronic

10   media belonging to Erik Peeters. (1721)  Combining DME from two different cases, involving

11   two different defendants, carries the concept of a "joint operation" to a new level.  Indeed,

12   there may be substantial search and seizure implications by combining separate digital

13   evidence on the same hard drive. Notwithstanding the issue of duplicating DME without a

14   search warrant, there may be expensive and time-consuming justification for defense counsel

15   to cause independent forensic evaluation, not only of all original DME in each case, but also

16   the combined hard drive.

17         As if to emphasize the magnitude of the joint operation involved in Ronald Boyajian's

18   arrest in Cambodia, on June 15, 2009, the Ambassador for the United States Embassy in

19   Phnom Penh, corresponded directly with the Prime Minister of Cambodia, Hun Sen, to request

20   that the Cambodian government abandon its investigation of Boyajian and, instead, expel him

21   to Los Angeles, California.  The Ambassador requested that the Cambodian Ministry of Justice

22   and the CNP "turn over all evidence, including copies of all CNP and prosecution reports,

23   photographs and videos to ICE Senior Special Agent Hung Nguyen, in order that Mr. Boyajian

24   can face criminal charges in the United States."   In so requesting, the American Ambassador

25   characterized the arrest of Ronald Boyajian as "a joint effort between the Cambodian National

26   Police (CNP), the Department of Homeland Security, Immigration and Customs Enforcement

27

28

1    (ICE) and the United States Embassy Regional Security Office (RSO)."   (1834)   Indeed, a

2    significant "joint operation."

3

4    **4.**    **Undercover Agent Isaac Veth Conducted an Illegal Covert Search and Seizure of**

5          **Boyajian's DME, on February 16, 2009, at 11:30 a.m.**

6          While Ronald Boyajian was gone from his room at the International Guest House, Isaac

7    Veth entered his upstairs room and seized, in addition to other items, all of Boyajian's DME,

8    including his laptop and other devices. Veth had no search warrant; but he certainly had an

9    undercover plan.  At the same time, APLE investigators were actively surveilling Boyajian's

10   whereabouts. Veth entered the building in somewhat of a disguise, wearing a helmet and

11   eyeglasses.  He brought with him an extremely large, handled container, on the order of a large

12   suitcase or a professional carrier.  He contacted the desk clerk on the first floor and had a

13   conversation with him before going upstairs to Boyajian's room.  He approached Boyajian's

14   room with certain knowledge of where it was located and emerged carrying items in both

15   hands and underneath his arms.  In addition to a coffee maker, he left with Boyajian's laptop

16   and additional unknown items in the large carrying container he brought with him.  He made

17   more than one trip up and down the stairs, and in and out of Boyajian's room to complete his

18   haul.

19         Attached as exhibit A are still photographs of a running videotape made that day by

20   various video cameras located throughout the building, at the main lobby, front desk, both

21   ends of all hallways, the stairway and a small area toward the back of the ground floor where

22   tenants keep their motor bikes.  The entire covert search and seizure by Isaac Veth, and more,

23   was memorialized on videotape.

24         At the time of Boyajian's arrest, ICE agents, undercover agents and other law

25   enforcement representatives were aware that Ronald Boyajian had previously suffered

26   convictions for sex crimes in the United States and was a registered sex offender.  ICE, in

27

28

1    particular, was aware that Boyajian had traveled numerous times, since 2000, to South East

2    Asia, including Cambodia.

3         Often, when Boyajian was traveling, he was detained at various airports and subjected

4    to "100% examinations," including searching and evaluating all DME he had on his

5    possession, including laptop computer, cameras and the like.  Treasury Enforcement Computer

6    System (TECS) reports were promulgated on each occasion (1537-48), and law enforcement

7    referral reports were made, detailing the carrier line involved, flight schedule, specific time

8    of search and findings. (1549-66)

9         For example, on February 21, 2005, he was detained while flying on China Airlines at

10   9:46 in the evening in connection with a trip to South East Asia.  The recorded remarks after

11   his detention, questioning and search were as follows:

12        PAX was in Cambodia for 3 months.  Left clothes over there because he

13        is going back in 1-1/2 months for a wedding for 2 weeks, then returning back

14        to the United States for good.  Works as a tutor for Stanford/Berkeley.

15        Specialty is physics but tutors in all subjects.  100% exam conducted.

16   (1557)

17        On October 25, 2005, when again traveling on China Airlines to Manila from San

18   Francisco, Boyajian was detained.  Remarks in connection with that detention and a search

19   were as follows:

20        PAX match for the one day lookout.  He was out for more than 20 days

21        to the Philippines and Cambodia.  Please verify.  No FIN number.

22        Gone 21 days for vacation is the scientist and physics currently as a tutor

23        at Stanford.  Pax lives at 250 Sharon Road, Menlo Park, California.  Pax had a

24        laptop but a search of hard drive revealed nothing.  100% bag exam, negative

25        results.

26   (1560)

27

28

On February 24, 2006, he was again detained while traveling to South East Asia, beginning at approximately 7:10 in the evening, whereby the record states: "Added from secondary-enforcement referral: Gone two months in Vietnam and Cambodia for vacation/scientist in physics/tutor at Stanford Uni V./negative exam." (1562)

On May 5, 2007, while traveling on China Airlines through Bangkok from San Francisco, he was stopped at 10:41 in the evening and again questioned and searched with "negative" results. The information regarding this stop stated as follows: "Primary action one day lookout refer to BGC secondary, no FIN number. Present not employed out to Bangkok/Cambodia couple months, media searched, negative." (1564)

All of the records of Boyajian's airport stops memorialize that he was detained due to law "enforcement referrals," likely generated by his passport through TECS or other systems, revealing that he was a registered sex offender, and that he was regularly detained and searched. In all of those searches, however, no child pornography was ever detected. It is inconceivable, therefore, that, in the context of the traffic stop, police escorting him to his guest house room for passport identification and his plans to leave the next morning by China Airlines to the United States, that he would have a laptop loaded up with child pornography.

**5.    The Search and Seizure of Defendant's Guest House Residence on February 20, 2009 Failed to Comply with Cambodian Law.**

Section 4 of the Cambodian Code of Criminal Procedure, sets forth the requirements for an arrest warrant. Article 96 provides that, "An arrest warrant may be issued against a charged person or any individual against whom there is evidence proving his guilt." Arrest warrant can only be issued, however, if an investigating judge finds, "that the offense in question is a felony or misdemeanor punishable by imprisonment." An arrest warrant may also be issued if, "the suspect has fled or whereabouts are unknown or staying outside the territory of the Kingdom of Cambodia." Although CNP and ICE agents were involved in

investigating, surveilling and even audio and videotaping Boyajian, within the last week prior to his arrest, no arrest warrant was obtained in his case.  Discovery in this case is bereft of any prior "evidence proving his guilt."  Instead, without evidence that Boyajian had committed a crime,either before or on the evening of his arrest on February 19, 2009, it appears that CNP and ICE, indeed simply "scooped him up," as they had planned.

Book 3 of the Cambodian Code of Criminal Procedure sets out provisions for investigation and searches associated with what the Code describes in Chapter 1 as "flagrant" felonies or misdemeanors.  Article 86 defines a flagrant felony or misdemeanor as one in which the suspect is caught "during the commission of a crime" or "immediately after the commission of a crime."  Alternatively, the law affecting a "flagrant" felony or misdemeanor applies when, "after a misdemeanor or felony has been committed, a suspect is being in hot pursuit by the public"; or "a person is found to have an object, or a scar, mark or other evidence from which it can be concluded that he committed or participated in the commission of an offense."

There is no evidence that, on the evening of Boyajian's arrest of February 19, 2009, he was detained or arrested while committing a crime or immediately after.  There is no evidence of "an object, or a scar, mark or other evidence" was detected or gathered by the combined law enforcement agencies involved, suggesting that he had just recently committed or participated in a crime.

Article 88 further provides that an offense shall be deemed to be a flagrant felony or misdemeanor "if a felony or misdemeanor has been committed on a site which the occupant has asked the Royal Prosecutor or a judicial police officer to establish."  There is no evidence that the owner or occupant of the residence at which law enforcement agenices contacted Boyajian, on the evening of his detention and arrest, had contacted police or any other law enforcement representative regarding an alleged commission of a crime at that "site" or residence.

For cases where a suspect is summoned voluntarily to court, Article 113 provides that:

> When the preliminary inquiry involves a felony or misdemeanor, judicial police officers may conduct a search and seize relevant exhibits. Judicial police officers shall seek an express and real approval from the occupant of the premises. The approval may be handwritten by the occupant of the premises. If he cannot write, a judicial police officer shall state in the written record that the occupant of the premises is illiterate and accepts the search.

> Where the occupant of the premises is absent or denies his search, the President of the Court of the First Instance, which has territorial jurisdiction on the case, may authorize a search upon a Prosecutor's request. The Prosecutor shall personally lead the search. Judicial police officer shall conduct the search in the presence of the occupant of the premises, or if he is absent, at the presence of two witnesses. The witnesses shall be assigned by the Prosecutor; they cannot be judicial police or military police who are participating in the search. The search cannot be conducted before 6:00 in the morning or after 6:00 in the evening.

Few of the requirements of Article 113 were complied with, in connection with the search of Ronald Boyajian's residence on February 20, 2009. No "express or real approval" was obtained from the occupant of the residence. No handwritten consent was obtained from the occupant. Nor was the search personally led by any "prosecutor."

Section 5 of the Cambodian Code of Criminal Procedure, entitled "Search and Seizure of Exhibits," provides, in relevant part, of Article 159, that, once an investigating Cambodian court has been assigned, there are explicit "Rules of Search":

> An investigating judge may conduct a search.

1    An investigating judge shall contact a search in the presence of the occupant of

2    the place.  In the absence of the occupants, the judge shall search in the presence of two

3    witnesses, to be selected by the judge.  The witnesses may not be police or military officers

4    from the force conducting the search.

5    An investigating judge may not conduct a search before 6:00 a.m. or after 6:00

6    p.m., except the case of searching:

7    –    at a place that is open to the public;

8    (1)    at a place where drugs are produced, stored, circulated, distributed or

9    consumed.

10    *        *        *

11    The investigating judge has to establish a written record of the search.  The

12    investigating judge, a clerk and the occupant of the place or the two witnesses shall sign the

13    search report.

14    The written record shall include the identity of the occupant of the place or the

15    two witnesses.

16    *        *        *

17    Again, as with the Article 113 requirements, the search of February 20, 2009, failed to

18    comply with virtually all of the requirements of Article 159.

19    In cases where a suspect is either caught in the act or fleeing from the commission of

20    a crime, Article 91 of the Cambodian Code may apply.  Article 91 sets out conditions and

21    requirements for a search and allows that police officers may conduct searches if they "first

22    obtain the authorization from the Royal Prosecutor, which is valid even if the authorization

23    is verbal."  Searching police officers, however, "may not conduct a search prior to 6:00 a.m.

24    or after 6:00 p.m.," unless (1) the search involves a flagrant felony or misdemeanor as

25    provided in Article 86, (2) the search involves a request by the occupant of the site, as stated

26    in Article 88, (3) there is a call for help from inside the site, (4) the location is open to the

27    public, or (5) the location contains drugs.  Furthermore, the police are required to "establish

28

Defense Motion to Suppress Evidence

1   a written record of the search, which shall include: The authorization of the Royal Prosecutor,

2   which shall include the date and time of such authorization; and the identity of the occupant

3   or of any witnesses."

4      The complaining witness in this case, abbreviated by agreement of counsel as "SL,"

5   herself informed law enforcement that she was not present at the time and location when

6   defendant Ronald Boyajian was arrested on the evening of February 19, 2009.  In his report

7   about the interview and statements given by SL, dated October 28, 2009, ICE agent Hung

8   Nguyen memorialized that, "The CNP informed ICE Bangkok that *SL was not present at*

9   *Xiens' house, when they arrested Boyajian*." (915, 1259)

10     On the evening of his arrest, Ronald Boyajian was not in the company of SL or  any

11  other minor children.  SL herself personally has reiterated that she was at home, and was not

12  present when a "John" was arrested.  Thus, Boyajian clearly was not committing or attempting

13  a crime against SL, or anyone else, at the time of his arrest.  ICE and CNP videotape of their

14  contact with Boyajian at the scene show him fully dressed and openly verbal about him not

15  committing any crimes. Boyajian appears to be somewhat intoxicated, but nonetheless

16  unequivocal in making clear his presence was innocent.

17     Boyajian's conduct was not, by any reasonable meaning of the term, "flagrant."  Nor

18  had he been involved in some type of "hot pursuit," for example, with police pursuing him

19  from one location to another after commission of a crime.  The combined agencies did not

20  come up on Boyajian, while he was attempting or having sexual interaction with SL, and then

21  chase him down as he sought to escape arrest.  The videotape evidence is simple and clear:

22  Boyajian stands and talks before the cameras, encouraging law enforcement to look for any

23  sign of a crime.

24     The actual conduct of Boyajian on the evening of his arrest did not constitute a

25  "flagrant" offense subject to the search requirements and conditions for searches involving "a

26  flagrant felony."  Even if the provisions of Article 91 were applicable, there is no reliable

27  evidence or record that, prior to conducting the entry, search and seizure into Ronald

28

Defense Motion to Suppress Evidence

Boyajian's guest house room on February 20, 2009, that a qualified "authorization from the Royal Prosecutor" was ever obtained.

Instead, the Senior Cambodian police officer at the site, Lieutenant Colonel Prum Vutha, stated in his official report that the search of February 20, 2009, was approved by the Cambodian Prime Minister himself: "On February 20, 2009, at 10:45, with His Excellency's permission, the department director cooperated with Tongmean (sic) Guest House, inspecting the room of the suspect - Boyasian-Ronald...." (336)

There is no mention of any "prosecutor" in Vutha's official report of that search. He expressly attributes the "permission" to search Boyajian's Guest House room to "His Excellency," referring to Vutha's boss, a Senior Deputy Director in anti-trafficking; Colonel Chun Heng, Deputy Director, and Vutha's Senior Officer. Thus, even if Article 91 were applicable -- requiring an assumption that a "flagrant" felony was involved -- no "Royal Prosecutor" authorized the search. Though politics may have attempted to trump the law, both Articles 91 and 113 of the Cambodian Code were violated.

Defense counsel notes, however, that in response to a recent, specific inquiry, the United States Attorney provided seemingly conflicting information with Prum Vutha's official report. On November 12, 2019, defense was provided somewhat illegible photocopies of Khmer notes by Prum Vutha, wherein he may have memorialized reference to verbal authorization for the search by a prosecutor, Sok Kalyan. For the time being, the belated handwritten notes are problematic, because they conflict with the official report by the same author, and raise other questions of authenticity and possible fabrication. Once this document is translated, it may be appropriate to have it evaluated by a questioned document expert, requiring inspection of the original notes and possible testimony.

The defense maintains neither Articles 91 or 113 were complied with in connection with the search of February 20, 2009. Thus, the search and seizure of Boyajian's DME was illegal under Cambodian law and subject to Article 109 of the Cambodian Code of Civil Procedure, entitled "Mandatory Rules," which provides that, "The Rules and Procedures

provided for in the following Article shall be strictly complied with, or the undertaking in violation of them shall be deemed as *null and void*."  Article 91 is the second provision subject to that fatal sanction.  Article 117 provides identical sanctions for noncompliance of Article 113.

**6.    After Defendant's DME Was Seized in the Search of His Guesthouse Room, on February 20, 2009, ICE Took Complete Custody of That Evidence and Subjected it to an Illegal  Warrantless Search.**

The record before this Court would appear that on July 24, 2009, Los Angeles ICE Agent Jonathan Ruiz applied for and obtained a search warrant from Magistrate Honorable Jacqueline Choolian to begin searching the DME that was originally seized in Phnom Penh, Cambodia, from Boyajian's guest house room, on February 20, 2009.  During the intervening four months, however, without benefit of search warrant, ICE agents from Cambodia, Bangkok, Thailand, and California, processed the DME by taking sole possession of that evidence from the CNP, duplicating it, viewing it externally and internally, and confirming that all copy images were completely replicated and extracted from the original DME.

On the same day as the search, February 20, 2009, Division Director of the Cambodian Department of Anti-Human Trafficking, Lieutenant General Bith Kim Hong, communicated directly with the Director of ICE in Bangkok, Thailand. (486)   He specifically stated that "Cambodian National Police do not have the specialists nor the equipment necessary to inspect and search evidence in the suspect's computer.  Therefore, we need assistance from your office to gather evidence in order to place charges against the above suspect."  The Director specifically requested that ICE agents take possession, "to inspect and search evidence," in order "to gather evidence in order to place charges" against Ronald Boyajian.

Senior ICE Agent Hung Nguyen details in an interim report how, two days after the request by Director Kim Hong, the CNP also contacted ICE for transfer of defendant's DME to ICE, including his McIntosh Pro laptop computer, Western Digital External hard drive and

a Sony 10 megapixel camera with an 8 megabyte memory card.  ICE promptly took possession of the original DME.  Then Senior ICE Agent Nguyen himself obtained a backup computer forensic image of those items, using a forensic imaging software.  Nguyen reports that, in duplicating the information, he "verified that the images were the same as the originals."  He was personally responsible for transferring those forensic images to ICE offices in Los Angeles.  Thereafter, the original DME was returned to the Cambodian National Police until, as Agent Ruiz stated in his search warrant affidavit, ICE Special Agent Perry Woo shipped the DME from Phnom Penh, Cambodia, on August 29, 2009, to Long Beach, California. (1260-63)

        Those interim search and seizure actions, exclusively undertaken by ICE agents on original DME seized in this case, from February 22, 2009 through August 29, 2009, should not have been undertaken without first obtaining a valid search warrant from a United States Magistrate.  ICE agents took the original DME from CNP, sent it to Bangkok, Thailand, where ICE agents continued to seize and possess it illegally, and electronically searched its contents sufficient to duplicate all the DME involved, and to verify that all the images copied were the same as the originals.  In so doing, ICE Agent Nguyen and his associates were aware that, in order to do so, they should have first "obtained a United States federal search warrant to search the electronic media." (1262)

        Without a search warrant authorizing the seizure and search of Boyajian's DME, ICE agents took physical possession of the equipment, under the supervision of Senior Ice Agent Hung Nguyen, and conducted a complete backup computer forensic imaging of Boyajian's laptop computer, external hard drive and 8-megabyte memory card..  Nguyen and his ICE agents used sophisticated forensic imaging software.  Nguyen, himself, personally searched, saw and verified that all the images obtained by that procedure were the same as images on the original DME.  Further procedures were undertaken to repeatedly check, view and confirm that the downloaded duplication matched the original source.

In the final paragraph of his report, Nguyen reports that the duplicated forensic images from Boyajian's DME were independently transferred to ICE's Los Angeles offices "for evidence storage"; and that the original equipment was "returned to the CNP."  The clear import of that characterization was that a complete, separate and distinct copy of all that ICE agent Nguyen could obtain from the DME was fully seized, extracted and viewed, and a copy maintained by ICE agents.  (1260-63)

Thus, between February 20 and October 27, 2009, ICE agents electronically copied all of the DME, kept a copy for themselves and sent the original DME back to the CNP in Phnom Penh, Cambodia.  The duplicated DME extracted in Phnom Penh, Cambodia, was then shipped, by Los Angeles ICE Assistant Special Agent in Charge, Perry Woo, to ICE offices in Long Beach, California.  At the time, two items were inexplicably missing: a Canon digital camera and a Nokia camera phone.  After investigation by ICE Cambodian Foreign Service National Investigator, Sous Vansak, the missing evidence was located and shipped back separately to Long Beach on October 29, 2009. (985-86)

**7.    Brief Statement of Legal Authorities.**

a.    Search and seizure of property owned by American citizens in foreign countries is subject to constitutional scrutiny.  If involved American officials and their agents are substantially involved in a foreign search and seizure, such that they participated in a joint operation between American and foreign officials and their agents, the exclusionary rule of the Fourth Amendment may apply.  See United States v. Barona, 56 F.3d 1087, 1092 (9th Cir. 1995); United States v. Rose, 570 F.2d 1358, 1362 (9th Cir. 1978); Brulay v. United States, 383 F.2d 345, 348 (9th Cir. 1967).

b.    In United States v. Peterson, 812 F.2d 486, 490 (9th Cir. 1987), the Ninth Circuit found that, because the United States and a foreign government were involved in a "joint investigation" and developed and shared information with each other, the United States

1   was involved in a "joint venture."  In reversing the District Court's no joint venture finding,

2   the Ninth Circuit noted that American agents themselves had described the operation as a

3   "joint investigation."  While simply labeling an activity "joint" is not conclusive of the specific

4   factual circumstances, documented opinions of the very participants cannot be ignored.

5          From high positions of government leadership to the very agents involved in

6   Ronald Boyajian's Cambodian investigation and arrest, characterization of the undercover

7   event in this case has uniformly been of "cooperation," "coordination of the investigation,"

8   "strengthening the existing cooperation and investigations," "unprecedented cooperation," and

9   the like.  More specifically, ICE agents, supervising and participating in the investigation and

10  arrest of Boyajian, have themselves expressly reported that "Operation Twisted Traveler" was

11  a "certified undercover operation conducted with the assistance of" a multitude of Cambodian

12  and American law enforcement representatives and NGO's. Los Angeles ICE Agent Jonathan

13  Ruiz, himself, characterized the role of Bangkok and Los Angeles agents as a "joint operation"

14  in conjunction with the Cambodian National Police.

15         The United States Attorney's office for the Central District of California emphasized,

16  in its release, that the arrest of Boyajian and two other Americans was "the direct result of the

17  unprecedented cooperation among U.S. authorities, such as the FBI and the Department of

18  State, the Cambodian government and NGO's."  Referring to the arrest of Boyajian and two

19  others, the United States Attorney's office described the operation as a "collaborative

20  investigative effort coordinated by ICE's Office of International Affairs."   In the same

21  communication, government prosecutors revealed that FBI and ICE agents had been directly

22  involved in training the CNP, local Cambodian law enforcement and NGO's, covering "all

23  aspects of child sex tourism investigations, ranging from search and seizure procedures and

24  surveillance techniques."

25  ///

26  ///

27

28

c.      The Ninth Circuit in <u>United States v. Barona</u>, 56 F.3d 1087 (9th Cir. 1995) sets forth the overreaching principles of law and reason, by which the propriety of the search and seizures in this case might be resolved:

Generally, the Fourth Amendment protection against unreasonable and warrantless searches and seizure, as well as the exclusionary rule, do not apply to the acts of foreign officials affecting United States citizens.  There are, however, two "very limited exceptions," whereby a citizen subjected to search and seizure in a foreign country does have some protections of the Fourth Amendment and the requirement of reasonableness.  One allows that evidence may be excluded, if the circumstances of the foreign search and seizure are so extreme that they shock the judicial conscience whereby a federal court should exclude the evidence.  This exclusion is not based on constitutional jurisprudence, but rather on the historically recognized role of courts to exercise supervisory powers, when necessary to preserve the integrity of the criminal justice system.

A second situation whereby American citizens may benefit from the exclusionary rule, arises when the participation of American agents in the investigation "so sufficiently substantial" that the law enforcement operation constitutes a joint venture or operation between the United States agents and foreign officials.  If a joint operation is found to have existed, then the law of the foreign country regarding search and seizure must be consulted and considered, as part of the determination whether or not the search was reasonable.  If the examining court finds that the applicable foreign law was not complied with, then the "good faith exception" to the exclusionary rule also becomes part of the analysis.  Courts reason that the good faith exception is grounded in the common sense realization that the exclusionary rule does not function as a deterrent, where officers clearly acted on a reasonable belief that their conduct or involvement in the operation was legal.  <u>Id</u>., at 190-93.

///

///

d.      The Ninth Circuit has cautioned that "a federal agent must not be permitted to do indirectly that which he cannot do directly, and thus circumvent the provisions of the Fourth Amendment against unreasonable search and seizure." Stonehill v. United States, 405 F.2d 738, 746 (9th Cir. 1968), cert. denied, 398 U.S. 960 (1969).  For purposes of search and seizure analysis, the test whether a private person is an agent for the searching government, depends on whether that person acted as either an instrument or agent for the state.  Coolidge v. New Hampshire, 403 U.S. 443, 487 (1971).  The government may not encourage conduct by private persons, however, that the government itself may not do.  United States v. Davis, 482 F.2d 893, 904 (9th Cir. 1973).  Even if the involved government does not encourage an otherwise unlawful search, if a private person searches solely for the purpose of aiding law enforcement, the search may be illegal.  Corngold v. United States, 3 F.2d 1 (9th Cir. 1966).

e.      If the circumstances of a foreign search and seizure are so unreasonable or extreme that they shock the judicial conscience, the federal court, in the exercise of its supervisory powers, can exclude evidence.  United States v. Rose, 570 F.2d 1358, 1361 (9th Cir. 1978).

**8.    Conclusion.**

Isaac Veth was an undercover agent for ICE and the CNP, who most actively participated in their joint operation to investigate, surveil and secretly taperecord Boyajian, in addition to seizing his DME loaded with child pornography.  The search and seizure of the DME conducted by Agent Veth could shock some judge's conscience.  If not, his actions were clearly unreasonable and without warrant or constitutional exception.  Thereafter, the next, "official" seizure of Boyajian's transplanted DME was unreasonable and conducted in violation of Cambodian law.

The third search and seizure of the original DME by ICE agents from CNP introduced a genuine, constitutional complication into this case.  While the DME was still in the

possession of the CNP, ICE could have obtained a search warrant, almost as easily as they did afterwards, when it was all finally shipped to the United States.  When ICE took possession of the DME, they certainly seized the evidence.  As certainly, they searched it.  ICE agents inventoried, photographed, viewed and recorded make and model information, serial numbers, and the like.  Then, still without a search warrant, they went "inside," both to make and verify copy images of the contents.  By doing so, the ICE agents in this case have left us all to guess just how invasive their search of the DME actually was.

All subsequent and more complicated searches of the DME undertaken here in the United States are "fruit" of the previous amalgam of unconstitutional searches and seizures. For those facts and circumstances recited within this motion, and the applicable legal authorities cited, it is respectfully requested that the DME evidence, identified within the introduction of this pleading, be suppressed and deemed inadmissible.

Dated: November 23, 2010                     Respectfully submitted,


                                             *Daniel G. Davis*
_____          DANIEL G. DAVIS
                                             Attorney for Defendant
                                             RONALD GERARD BOYAJIAN

Defense Motion to Suppress Evidence