1  ANDRÉ BIROTTE JR.
   United States Attorney
2  ROBERT E. DUGDALE
   Assistant United States Attorney
3  Chief, Criminal Division
   PATRICIA A. DONAHUE (California Bar No. 132610)
4  KAREN I. MEYER (California Bar No. 220554)
   DAVID M. HERZOG (California Bar No. 224594)
5  Assistant United States Attorneys
   Violent and Organized Crime Section
6       United States Courthouse
7       312 North Spring Street, 15th floor
        Los Angeles, California 90012
8       Telephone:  (213) 894-0640/8559/0600
        Facsimile:  (213) 894-6436/3713
9       E-mail:  patricia.donahue@usdoj.gov
                 kim.meyer@usdoj.gov
10               david.herzog@usdoj.gov
11
12 Attorneys for Plaintiff
   UNITED STATES OF AMERICA
13
14                  UNITED STATES DISTRICT COURT
15            FOR THE CENTRAL DISTRICT OF CALIFORNIA
16 UNITED STATES OF AMERICA,   ) CR No. 09-933(A)-CAS
                               )
17           Plaintiff,        ) OPPOSITION TO MOTION TO SUPPRESS
                               ) EVIDENCE RESULTING FROM ALLEGEDLY
18           v.                ) UNLAWFUL SEARCHES; Memorandum of
                               ) Points and Authorities
19 RONALD GERARD BOYAJIAN,     )
20      aka "John",            ) Date:      Feb. 11, 2011
                               ) Time:      2:00 p.m.
21           Defendant.        ) Place:     Courtroom of the
                               )            Hon. Christina A. Snyder
22                             )
                               )
23                             )
   _____ )
24
25      Plaintiff United States of America hereby submits its
26 opposition to the motion filed by defendant Ronald Gerard
27 Boyajian to suppress the evidence seized from the searches.
28

(CR 34).  This opposition is based on the attached memorandum of points and authorities, the declarations of Prum Vutha, Keo Thea, Sreng Hong, Chan Somphors, Tim Huon, I.V., Koeut Rith, and Hung Nguyen, and the exhibits to those declarations, filed concurrently herewith, the files and records of this case, and evidence and argument presented at the hearing.

DATED: January 18, 2011        ANDRÉ BIROTTE JR.
                               United States Attorney

                               ROBERT E. DUGDALEL
                               Assistant United States Attorney
                               Chief, Criminal Division


                               _____/s/_____
                               PATRICIA A. DONAHUE
                               KAREN I. MEYER
                               DAVID M. HERZOG
                               Assistant United States Attorneys

                               Attorneys for Plaintiff
                               United States of America

2

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

**INTRODUCTION**

Defendant Ronald Gerard Boyajian ("defendant") moves the court to suppress the evidence seized from the guesthouse room where defendant had been staying by the Cambodian National Police ("CNP") when they were conducting a search authorized by the prosecutor, as required by Cambodian law.  That evidence consists of computer media that contains several hundred images of child pornography that does not appear to have been produced by defendant; 27 images of child pornography taken in what appears to be a Cambodian brothel by the same model of camera defendant owned; 19,000 images of children's feet, legs, and buttocks; and several images of defendant holding and standing next to a young woman or girl.[1]  Defendant claims that the search violated the Fourth Amendment and Cambodian law.  Defendant's claims are without merit.

As set forth below, in 2008 and 2009 United States Immigration and Customs Enforcement ("ICE") was assisting the CNP in the identification and investigation of United States citizens who traveled to Cambodia and engaged in illicit sexual conduct with children.  When defendant, who has prior convictions in

---

[1] Part of defendant's hard drive space was encrypted.  The government is endeavoring to unlock the encryption prior to trial.  If the government is successful, the government will also seek to introduce any relevant material recovered from the encrypted portions of defendant's hard drive.  In any event, the government will seek to introduce the fact that some of defendant's media was encrypted as evidence of consciousness of guilt.

1

1  California for sexual conduct with minor girls, was identified as
2  one of those individuals, ICE provided assistance to the CNP.   In
3  Cambodia, a nongovernmental organization surveilled defendant
4  traveling to Svay Pak, a village near Phnom Penh where children
5  were offered for sale for sex.   The CNP conducted its own
6  investigation, and was not acting at the direction of ICE.
7  However, in light of cooperation between the CNP and ICE, the
8  joint venture exception to the general rule that the Fourth
9  Amendment does not apply to the actions of foreign law
10 enforcement is triggered.

11     The reasonableness requirement of the Fourth Amendment, but
12 not the warrant clause, therefore applies to the actions of the
13 CNP.   The Ninth Circuit has held that the reasonableness
14 requirement is satisfied by compliance with foreign law.   The
15 evidence set forth in the declarations of Prum Vutha, Keo Thea,
16 Sreng Hong, Chan Somphors, Koeut Rith, and Hung Nguyen submitted
17 concurrently with this opposition demonstrate that the search by
18 the CNP complied with Cambodian law.[2]   The CNP seized computer
19 media, and requested ICE assistance in searching that media
20 because the CNP does not have the technical expertise to conduct
21 a forensic search of computer evidence.   At the request of the
22 CNP, ICE Special Agent ("SA") Hung Nguyen, who has training and
23 experience in computer forensic examinations, made forensic
24 images of the computer media.   He did not conduct a search of the
25
26
27     [2] Defendant also claims that a search was conducted by I.V.
   The declarations of I.V. and Tim Huon, submitted concurrently
28 herewith, demonstrate that it was defendant who requested that
   I.V. move his property, and that no search occurred.

2

computer media.  Instead, SA Nguyen shipped the forensic images to the Central District of California, where a federal search warrant was obtained.

The original computer media remained in Cambodia, in the custody of the Cambodian government until September 2009, when it was turned over to ICE and shipped to the Central District of California.  ICE subsequently searched it pursuant to a federal search warrant.  In short, the searches of the computer media in this case – specifically, the search of the forensic images and the search of the original media – were conducted pursuant to federal search warrants issued in this district.  Accordingly, defendant's claims of Fourth Amendment violations are without merit, and the government respectfully requests that the Court deny his motion.

## II.

### SUMMARY OF ARGUMENT

The government has submitted several declarations in support of this opposition.  The Declaration of Koeut Rith, who is an Undersecretary of State at the Ministry of Justice in the Cambodian government, sets forth the provisions of the Code of Criminal Procedure that apply to the investigation that the CNP conducted of defendant.  Attached to that declaration are the Code in Khmer, as well as a translation, and several documents issued by the court in Phnom Penh that Mr. Koeut examined.[3]

The Declarations of CNP Major Keo Thea, CNP Officer Sreng Hong, and Action Pour Les Enfants ("APLE") Investigator Chan Somphors set forth the events that led to defendant's arrest in

---

[3] In Cambodia, an individual's surname is placed first.

3

Cambodia for purchasing child prostitution.   The Declaration of
Colonel Prum Vutha, who obtained authorization for and conducted
the search of defendant's room at a guesthouse in Phnom Penh,
sets forth the search and seizure by the CNP of defendant's
property, which consisted primarily of digital media and related
items.   Several documents are attached to Colonel Prum's
declaration.   Those documents are written in Khmer, the language
spoken in Cambodia.   They have been translated into English, and
the English translation is attached to its Khmer counterpart.
The Declaration of SA Nguyen, a computer forensics agent,
explains that at the request of the CNP he created a forensic
image of the digital media seized from defendant's guesthouse
room, but that the United States government searched the media
only pursuant to a federal search warrant.

Finally, the Declarations of Tim Huon and I.V. establish
that I.V., who had befriended defendant in Cambodia and was
providing information to APLE about defendant, did not conduct a
search of defendant's property.   In the photographs attached to
defendant's motion, I.V. is seen moving a bag and several items
that belonged to defendant.   I.V. moved those items at the
request of defendant.   It was not a government search.

**III.**

**STATEMENT OF FACTS**

**A.    Background**

In late January and February 2009, APLE investigators
surveilled defendant going on his motorcycle from Phnom Penh to a

4

1  blue house next to a pond in the village of Svay Pak.[4]  (Chan
2  Decl. ¶ 4; Prum Decl., Ex. A).  Svay Pak, which is also known as
3  Kilo 11, is a small area located approximately 11 kilometers
4  outside Phnom Penh, Cambodia.  The people who live in Svay Pak
5  are very poor.  Most of the people who live in Svay Pak are
6  Vietnamese immigrants to Cambodia.  (Thea Decl. ¶ 3).  From the
7  early 1990s until approximately 2008 to 2009, Svay Pak was well
8  known as an area where an adult could openly buy sex with a
9  child.  (Thea Decl. ¶ 3; Chan Decl. ¶ 3; Sreng Decl. ¶ 3).  In
10  2008 and 2009, an increased law enforcement presence in Svay Pak
11  drove that criminal activity underground and there was a greater
12  effort by the people who offer children for sale for sex to hide
13  their crimes.  (Thea Decl. ¶ 3).
14       Defendant usually went to Svay Pak in the evenings, between
15  approximately 7:30 p.m. and 10:30 p.m., to a blue house that
16  belonged to a woman named Ny.  (Chan ¶ 4; Vutha Decl. Ex. A).
17  APLE Investigator Chan was familiar with Ny's house as a location
18  where foreigners went to have sexual contact with children.
19  (Chan ¶ 4).  APLE had learned that Hou Ngoy, a known pimp,
20  brought customers to Ny's house for sexual contact with girls
21  under the age of 18 in exchange for money.  (Chan Decl. ¶ 5).
22  APLE also had learned that defendant was one of the customers
23  whom Ngoy brought to Ny's house.  (Id.)
24       On February 12, 2009, Investigator Chan observed defendant
25  go inside Ny's house, followed by Ny with two girls.  (Chan Decl.

26  _____

27       [4] Action Pour Les Enfants ("APLE") is a non-governmental
    human rights organization established to combat the sexual
28  exploitation of children.  (Huon Decl. ¶ 1).

5

1   ¶ 5; Prum Decl. Ex. A).  One of the girls was Ny's daughter, who

2   appeared to be about 13 years of age, and the other girl appeared

3   to be about 10 years of age.  (Id.)  Approximately five minutes

4   later, Ny and her daughter came out of the house, but the other

5   girl did not come out.  (Id.)  Defendant and the girl who

6   appeared to be about 10 years old remained in the house.  (Id.)

7   **B.   The Arrest**

8        On February 19, 2009, in the late afternoon, Investigator

9   Chan observed defendant ride his motorcycle into Svay Pak.  (Chan

10  Decl. ¶ 7).  Investigator Chan drove his motorcycle to a location

11  where he could observe Ny's house, and he saw defendant park his

12  motorcycle and walk to Ny's house.  (Id.).

13       Defendant went inside the house, followed by Ny and two

14  girls, who appeared to be approximately 12 to 13 years of age.

15  (Id.).  Investigator Chan left his location in order to provide

16  this information to his supervisor, and when he returned to the

17  area where he could see Ny's house, Investigator Chan observed

18  that defendant's motorcycle was gone.  (Chan Decl. ¶¶ 7, 8).  A

19  young man, whom Investigator Chan believed was Ny's son, drove up

20  to Ny's house on defendant's motorcycle, carrying wine.  (Chan

21  Decl. ¶ 8).

22       At Investigator Chan's direction, a woman walked past Ny's

23  house, looked inside, and saw defendant.  (Chan Decl. ¶ 8).

24  Investigator Chan and police officers, including CNP Major Keo

25  and Officer Sreng, approached Ny's house.  (Chan Decl. ¶ 10; Keo

26  Decl. ¶ 5; Sreng Decl. ¶ 5).  Investigator Chan moved his

27  motorcycle to be closer to the house.  (Chan Decl. ¶ 10).

28

In Svay Pak there is a main road, along which there are structures that are very close together. (Thea Decl. ¶ 3; Chan Decl. ¶ 3; Sreng Decl. ¶ 3). Between those structures, there are small passages that are crooked and so narrow that it is not possible to drive a motorcycle down some of them. (Id.) There are no streetlights, and there are many plants and trees near the passages and around the structures. (Id.) It is difficult to conduct surveillance in Svay Pak. (Id.)

As the police approached the house, Officer Sreng saw five to six girls standing in front of defendant, who was sitting in front of the door. (Sreng Decl. ¶ 5). The girls appeared to be twelve to thirteen years old. (Id.) There was also a young man, who was about 20 years old, standing near the girls, and he was not wearing a shirt. (Id.) Officer Sreng saw defendant hand money to one of the girls. Based on his experience investigating child sex crimes in Cambodia, Officer Sreng knew that in nearly every case there is a person who takes the girls to the foreigner for sexual acts. (Id.) He thought this young man might be the person who brought the girls to defendant so defendant could choose which girl or girls with whom he wanted to have sex. (Id.)

As law enforcement approached the house, Investigator Chan heard a child screaming in the Vietnamese language, and although he did not know what the child was screaming about, based on his experience he believed the child was signaling to the people inside the house. (Id.) Major Keo and Officer Sreng heard people yelling "Police! Police!" in Vietnamese, and Major Keo believed that this was a warning to the people inside the house. (Keo Decl. ¶ 5; Sreng Decl. ¶ 6).

7

1    As the officers approached and people yelled "Police",
2    defendant and the young man ran away. (Thea Decl. ¶ 5; Sreng
3    Decl. ¶ 6; Chan Decl. 10). At Major Keo's direction, Officer
4    Sreng chased defendant. (Thea Decl. ¶ 5; Sreng Decl. ¶ 6).
5    Officer Sreng chased defendant down a narrow road. (Sreng Decl.
6    ¶ 7). It was dark. (Id.) The young man was running down the
7    narrow road ahead of defendant as Officer Sreng pursued him.
8    (Id.) The young man disappeared into one of the structures along
9    the narrow road. (Id.) Defendant ran approximately 200 meters
10   before he arrived at an area with some empty land and trees,
11   where he hid beneath a tree. (Id.) Officer Sreng yelled "Stop!
12   Stop!" and grabbed defendant by the collar. (Id.) Another
13   officer arrived and assisted Officer Sreng in bringing defendant
14   back to the blue house. (Id.)

15   While Officer Sreng was chasing defendant, Major Keo ran
16   into the house to rescue the victims. (Thea Decl. ¶ 6). When he
17   got inside, no one was there; he saw a deep hole in the floor,
18   like a trap door, and it appeared that whomever had been in the
19   house had jumped into the hole and left. (Id.) He saw that a
20   bedsheet had been hung from the ceiling to divide the room into
21   two areas, and he saw a mattress on the floor. (Id.).

22   It appeared to Investigator Chan that when defendant took
23   off running from the blue house as the police approached,
24   defendant was not wearing a shirt, but that defendant was wearing
25   a shirt when the police returned to the house with him; Officer
26   Sreng recalled that defendant was wearing a dark shirt and the
27   young man who ran away ahead of defendant was shirtless. (Chan
28   Decl. ¶ 10; Sreng Decl. ¶ 7). When they arrived back at the blue

1  house, Officer Sreng saw money on the ground in the area where he
2  previously had seen defendant handing money to the girl in front
3  of the house.  (Sreng Decl. ¶ 8).  Officer Sreng believed that
4  defendant dropped the money that he was paying the girl when he
5  started running away from the blue house.  (Id.)

6      Major Keo, Officer Sreng, and Investigator Chan each
7  believed that defendant had just purchased child prostitution, in
8  violation of Article 34 of the Kingdom of Cambodia Law on
9  Suppression of Human Trafficking and Sexual Exploitation.  (Keo
10 Decl. ¶ 5; Sreng Decl. ¶ 9; Chan Decl. ¶ 11).  The report signed
11 by Colonel Prum stated that defendant was detained while involved
12 with a girl at the house in Svay Pak.  (Prum Decl. Ex. B).

13 **C.   The Search**

14     The next morning Colonel Prum called Deputy Prosecutor Sok
15 Kalyan and requested permission to search defendant's room at the
16 Tong Mean Guesthouse.  (Prum Decl. ¶ 6; Ex. D).  Colonel Prum
17 believed and continues to believe that under Article 91 of the
18 Cambodian Code of Criminal Procedure, the prosecutor could give
19 verbal authorization over the telephone to conduct the search.[5]
20 (Prum Decl. ¶ 6).

21     After receiving permission from the prosecutor and from the
22 guesthouse representative to search defendant's room at the Tong
23 Mean Guesthouse, Colonel Prum and other CNP officers searched

24

25     [5]  Colonel Prum also asked and received permission from Mr.
    Tang Men Lang, a representative of the Tong Mean Guesthouse, for
26 permission to search defendant's room.  Mr. Tang Men Lang gave
    the CNP permission to search defendant's room and instructed the
27 receptionist at the Tong Mean Guesthouse, Molinda, to give the
    CNP written permission to search defendant's room.  (Prum Decl.
28 ¶ 7; Ex. B.).

Room 302, which was the room in which defendant had been staying while he was at the Tong Mean Guesthouse.  (Prum Decl. ¶ 8).  In addition to the CNP officers, defendant, Mr. Tang Men Lang, and Mrs. Long Sinet, who interpreted from Khmer to English for defendant, were also present.  (Id.)  The search ended at approximately 11:15 a.m.  (Id.)  The Confiscation Report signed by Colonel Prum listed the following items that were seized during that search: one Apple laptop computer; one Nokia telephone; one Canon camera; one memory flash, micro H.C., cash and a bottle of Scabiderm.  (Prum Decl. ¶ 8; Ex. F).  The CNP officers took these items to the CNP Department of Anti-Human Trafficking and Juvenile Protection office in Phnom Penh to be used as evidence in a prosecution of defendant in Cambodia.  (Prum Decl. ¶ 8).

As set forth above, computer equipment was among the items that the CNP seized from defendant's room at the Tong Mean Guesthouse.  (Prum Decl. ¶ 9).  At the time of the seizure, the CNP did not have the specialists or equipment necessary to inspect and search defendant's computer equipment.  (Id.)  As a result, on February 20, 2009, CNP Lieutenant General Bith Kim Hong signed a request to the Director of the ICE Office in Bangkok, Thailand, asking ICE to inspect defendant's computer and gather evidence that the CNP could use to bring charges against the suspect defendant in Cambodia.  (Id., Ex. G).

**D.   CNP Request for ICE Assistance**

On February 20, 2009, SA Nguyen went to the CNP offices and observed the items that the CNP had seized from defendant's room. (Nguyen Decl. ¶ 6).  SA Nguyen had received training on computer evidence recovery and had investigated numerous cases containing

10

computer evidence and conducted numerous computer acquisitions
and examinations.  (Nguyen Decl. ¶ 2).  CNP Lieutenant General
Bith Kim Hong asked SA Nguyen verbally to assist the CNP by
inspecting the computer media seized from defendant's room in
order to gather evidence to support charges against defendant in
Cambodia.  (Nguyen Decl. ¶ 6).  SA Nguyen informed him that he
could make a forensic image of the computer media in order to
preserve it, but that because defendant was a United States
citizen, SA Nguyen could not search or review the data absent a
search warrant.  (Nguyen Decl. ¶ 7).  SA Nguyen asked General
Bith Kim Hong for a written request, which SA Nguyen subsequently
provided. (Nguyen Decl. ¶ 9; Ex. A).  SA Nguyen left Cambodia to
return to his office in Bangkok, Thailand, to retrieve the
equipment necessary to image the computer data, which he did not
have with him in Cambodia at the time of defendant's arrest.
(Nguyen Decl. ¶ 8).  He returned with that equipment and went to
the CNP on February 22, 2009, to retrieve the electronic media to
image the data.  (Id.).

On February 22, 2009, at the office of the CNP in Phnom
Penh, the CNP provided SA Nguyen with a backpack and informed him
that the backpack contained items that CNP had seized from
defendant's room, and that CNP was turning those items over to
him so that ICE could assist the CNP by conducting a forensic
examination.  Upon receiving the backpack from CNP, SA Nguyen,
along with SAs Woo and Sullivan, inventoried the items contained
in the backpack.  Those items included defendant's United States
passport; one silver Macbook Pro laptop that contained a Fujitsu
hard drive; one Western Digital external hard drive; one Canon

digital camera with a battery charger and one unlocked memory card found within the Canon camera, and one Nokia phone with a memory card.[6]  (Nguyen Decl. ¶ 11).

On February 22, 2009, pursuant to CNP's request, SA Nguyen was able to make forensic images of the hard drive inside the Macbook laptop, the Western Digital external hard drive, and the memory card that had been inside the Canon camera.  (Nguyen Decl. ¶ 12).  SA Nguyen verified that the images were the same as the originals through a process called forensic hashing, which involves the use of a mathematical function, or algorithm, to generate a numerical identifier for data (such as a particular file).  If the data is changed, even very slightly (such as the addition or deletion of a comma or a period), the identifier should change.  A hash value can be thought of as a "digital fingerprint" for data.  The hash values of the three images were the same as the hash values of the original items.  (Id.).

SA Nguyen placed the forensic images of those three items onto an external hard drive that he subsequently shipped to the ICE office in Long Beach, California.  (Nguyen Decl. ¶ 13-15).  A federal search warrant was obtained in this district to search the forensic images on that hard drive.  At no point did SA Nguyen examine the contents of the original media or of the images.  (Id.).

---

[6] The items also included seven miscellaneous cd/dvds; one phone charger; one APPLE portable power adapter; two computer/ electronic cables; three bottles of anti-lice cream; and documents including China Air Flight card WA076527 record number k54d74.  (Nguyen Decl. ¶ 11).

1   In the fall of 2009, after defendant was brought from
2   Cambodia to the United States, the original evidence seized by
3   the CNP from the Tong Mean Guesthouse was shipped to the ICE
4   office in Long Beach, California.  (Nguyen Decl. ¶ 20).  It was
5   searched pursuant to a federal search warrant issued in this
6   district.  (Id.).

7   **E.   Defendant's Request to I.V. to Move Defendant's Items**

8   In 2008, while in Cambodia, defendant became acquainted with
9   an individual whose initials are I.V.  I.V. befriended defendant
10  and provided information about him to APLE.[7] (I.V. Decl. ¶ 3).

11  On February 16, 2010, at around noon, Tim Huon, the
12  Investigations Coordinator for APLE, spoke with I.V.  Defendant,
13  whom APLE knew at the time as "John," frequently would stay at
14  the International Guesthouse ("IGH") in Phnom Penh during the day
15  and go to Svay Pak in the evenings.  (Tim Decl. ¶ 5(a)).  On
16  February 16, 2009, APLE investigators who were surveilling "John"
17  did not see him at the IGH, so Investigation Coordinator Tim
18  called I.V. to ask if I.V. knew where "John" was located.  (Id.).
19  I.V. stated that "John" and he had planned to meet at the office
20  of China Airlines that day.  (Id.).  The office of China Airlines

---

[7] Since 2008, I.V. has provided information, on an
infrequent basis, to APLE about individuals whom I.V. suspected
had come to Cambodia to engage in sexual conduct with minors.
APLE has never paid I.V. for providing information.  APLE has
offered to reimburse I.V. for expenses that he has incurred in
connection with his efforts to obtain information to provide to
APLE, but I.V. has refused APLE's offer to reimburse him.
Whenever APLE received information from I.V., APLE would analyze
it and make its own determination whether the information was
pertinent.  If APLE believed the information was relevant, it
would conduct its own independent investigation to determine
whether the information was accurate.  (Tim Decl. ¶ 3).

13

is located at a travel agency in Phnom Penh called Angkor
Airways.  (Id.).  Based on this information, Investigation
Coordinator Tim asked APLE Investigator Chan Somphors to go to
the Angkor Airways office and look for "John."  (Id.).
Investigation Coordinator Tim learned from Chan Somphors that at
approximately 2:00 p.m., he saw "John" and I.V. at the Angkor
Airways office.  (Id.; Chompors Decl. ¶ 6).

On the morning of February 16, 2009, I.V. had met up with
defendant a few blocks away from the IGH in Phnom Penh, where
defendant had been staying.  (I.V. Decl. ¶ 4).  Defendant asked
I.V. to go into his room at the IGH to get his belongings,
because he was scared that he was being followed.  (Id.).
Defendant said that he did not know who was following him, but he
was worried and scared and did not want to go back inside the
IGH.  (Id.).  I.V. agreed to go to his room in that guesthouse
and get defendant's items. (Id.).

Defendant gave I.V. the key to defendant's room at the IGH.
(I.V. Decl. ¶ 5).  I.V. drove to the IGH and told the person at
the IGH front desk that he was there to get defendant's things.
(Id.).  The person at the front desk recognized I.V. as
defendant's friend and let him go up to defendant's room. (Id.).
I.V. went to defendant's room and saw a coffeemaker, some stereo
speakers, and a black bag that was packed and ready to go.  (I.V.
Decl. ¶ 7).  I.V. took these items down to the main floor of the
IGH.  (Id.).  When he finished bringing the items downstairs,
I.V. took defendant's items to the office of Angkor Airways
travel agency.  (Id.).  I.V. went to the travel agency because
defendant had told him to meet defendant there after I.V. had

14

retrieved defendant's items from the IGH.  (Id.).

At the office of Angkor Airways, I.V. gave defendant his items, and they talked for awhile.  (I.V. Decl. ¶ 7).  I.V. believed that defendant was there in order to buy a plane ticket to leave Cambodia.  (Id.).  When they left the Angkor Airways travel agency, they went their separate ways.  (Id.).

Investigations Coordinator Tim spoke with I.V. again in the evening of February 16, 2009. (Tim Decl. ¶ 5(b).  I.V. told him that earlier that day he had helped move "John's" property. (Id.).  I.V. stated that "John" had told I.V. that "John" could not go back to the IGH because "John" believed that someone was following him.  (Id.).  I.V. stated that "John" had asked I.V. to go to the International Guesthouse and get the items that "John" had left in his room there.  (Id.).  I.V. stated that he had gone to "John's" room, picked up "John's" belongings, and handed them to "John" personally.  According to I.V., "John" said that he was changing to the Tong Mean Guesthouse because he was scared that someone was following him, and that was why he had asked I.V. to move some of his belongings for him.  (Id.).

I.V. did not search the black bag.  (Id.).  No one from APLE, the CNP, or any law enforcement agency, told I.V. to search defendant's items.  (I.V. Decl. ¶ 8; Tim Decl. ¶ 7).  Neither Tim nor anyone from APLE told I.V. to seize or search defendant's property.  (Tim Decl. ¶ 7).  Tim did not ask, and I.V. did not tell him, what items I.V. had retrieved for defendant.  (Id.).

## IV.

## ARGUMENT

The Ninth Circuit has recognized the "general and undisputed

15

proposition" that "neither our Fourth Amendment nor the judicially created exclusionary rule applies to acts of foreign officials." <u>United States v. Barona</u>, 56 F.3d 1087, 1090-91 (9th Cir. 1995) (citations omitted).  Thus, evidence obtained by foreign police officers from searches conducted in their own countries generally is admissible, regardless whether the search complied with the Fourth Amendment.  <u>See</u> <u>Stonehill v. United States</u>, 405 F.2d 738, 743 (9th Cir. 1968) ("Neither the Fourth Amendment of the United States Constitution nor the exclusionary rule of evidence, designed to deter Federal officers from violating the Fourth Amendment, is applicable to the acts of foreign officials.").

There are two exceptions to the general rule admitting evidence resulting from foreign searches and arrests.  <u>Barona</u>, 56 F.3d at 1091.  The first exception, inapplicable here, "occurs if the circumstances of the foreign search and seizure are so extreme that they shock the judicial conscience, so that a federal appellate court in the exercise of its supervisory powers can require exclusion of the evidence."  <u>Id.</u> (citations omitted).  Defendant has not alleged, nor is there any evidence, that the Cambodian National Police engaged in conduct that would "shock the judicial conscience."  To the contrary, the actions of the CNP were reasonable and in compliance with Cambodian law.  The first exception does not apply.

The second exception to the rule admitting evidence resulting from foreign searches applies "when United States agents' participation in the investigation is so substantial that the action is a joint venture between United States and foreign

16

officials." Id.; Stonehill, 405 F.2d at 743 ("If Federal agents
[have] so substantially participated in the raids so as to
convert them into joint ventures between the United States and
the foreign officials, then the exclusionary rule may apply.").
Whether the involvement of United States agents rises to the
level of substantial participation is a fact-specific inquiry,
with no one factor being determinative.   In Stonehill, the Ninth
Circuit found no joint venture when United States officials were
present during the planning of searches in the Phillippines and a
few days after the searches they obtained some of the seized
evidence.   That the Phillippines Supreme Court ultimately found
the raid illegal, and that the raid would have been found illegal
in the United States, did not render the evidence inadmissible in
the United States.   Id. at 746.

    In this case, as ICE has publicly acknowledged, ICE provided
assistance to the CNP in the CNP's investigation of United States
citizens who travel to Cambodia and engage in sex acts with
children.   As set forth above, the CNP specifically requested ICE
assistance in examining the digital media.   The CNP conducted its
own independent investigation of defendant for violating
Cambodian law.   ICE did not direct that investigation, but it did
provide aid in that investigation sufficient to trigger the joint
venture exception to the rule set forth in Barona.   The
government respectfully submits that under the joint venture
exception, compliance with Cambodian law is sufficient to meet
the Fourth Amendment requirements, and that the search and
seizure of defendant's items from the Tong Mean Guesthouse
complied with Cambodian law.

17

**A. Evidence from the Search of Defendant's Guesthouse Room is Admissible Because Compliance with Cambodian Law Satisfies the Fourth Amendment's Reasonableness Requirement.**

In joint venture cases, where the participation of United States officials is sufficient to require application of the Fourth Amendment, the reasonableness of the search is measured by compliance with foreign law. United States v. Juda, 46 F.3d 961, 968 (9th Cir. 1995) ("a foreign search is reasonable if it conforms to the requirements of foreign law"). As the court explained in Barona, 56 F.3d at 1093 n.1, "[C]ompliance with foreign law alone determines whether the search violated the Fourth Amendment."[8]

The government must show compliance with the foreign law, but need not show that the evidence was seized pursuant to a warrant. In Barona, the Ninth Circuit noted that "foreign searches have neither been historically subject to the warrant procedure, nor could they be as a practical matter." Barona, 56 F.3d at 1092 n.1. Likewise, in In re Terrorist Bombings of the U.S. Embassies in East Africa, United States v. Odeh, 552 F.3d 157, 167 (2d Cir. 2008), the Second Circuit held that the Fourth Amendment's warrant requirement does not govern searches conducted abroad by U.S. agents, and that such searches need only

---

[8] Although the court in United States v. Peterson, 812 F.2d 486, 490 (9th Cir. 1987) stated that foreign law must be consulted as "part of" the Fourth Amendment's reasonableness determination, Barona clarified that the other "part" of this analysis is the good faith exception, which can apply if foreign law was not followed, not another substantive requirement, Barona, 56 F.3d at 1093 n.1. Barona specifically held that compliance with foreign law is the only requirement for a reasonable search. Id.

satisfy the Fourth Amendment's reasonableness requirement.   In
Odeh, the court stated that although the question whether a
warrant is required for overseas searches of United States
citizens had not been decided by the Supreme Court or other
circuit courts, the Supreme Court provided guidance on the issue
in United States v. Verdugo-Urquidez, 494 U.S. 259, 274 (1990).

In Verdugo-Urquidez, the Court expressed doubt that the
Warrant Clause governed overseas searches conducted by U.S.
agents, noting that a search warrant issued in the United States
to search in a foreign country would be a "dead letter outside
the United States." Id.  The Odeh court cited the concurring and
dissenting opinion in Verdugo-Urquidez and concluded that "seven
justices of the Supreme Court endorsed the view that U.S. courts
are not empowered to issue warrants for foreign searches." Odeh,
552 F.3d at 169.[9]

The court in Odeh stated that a number of factors, including
the opinions in Verdugo-Urquidez, weigh against imposing a
warrant requirement on overseas searches." Id.  The court
explained that "[f]irst, there is nothing in our history or our
precedents suggesting that U.S. officials must first obtain a
warrant before conducting an overseas search," and "[s]econd,

---

[9] See also Verdugo-Urquidez, 494 U.S. at 278 (Kennedy, J.,
concurring) (explaining that several factors counsel against
overseas application of the warrant requirement, including, "the
absence of local judges or magistrates available to issue
warrants, the differing and perhaps unascertainable conceptions
of reasonableness and privacy that prevail abroad, and the need
to cooperate with foreign officials"); Verdugo-Urquidez, 494 U.S.
at 279 (Stevens, J., concurring) (concluding that the Warrant
Clause does not apply to overseas searches of noncitizen's homes
because of the powerlessness of American magistrates to authorize
such searches).

nothing in the history of the foreign relations of the United States would require that U.S. officials obtain warrants from foreign magistrates before conducting searches overseas or, indeed, to suppose that all other states have search and investigation rules akin to out own." Odeh, 552 F.3d at 169-170. "[T]hird, if U.S. judicial officers were to issue search warrants intended to have extraterritorial effect, such warrants would have dubious legal significance, if any, in a foreign nation," and "[f]ourth and finally, it is by no means clear that U.S. judicial officers could be authorized to issue warrants for overseas searchers." Id. at 171.[10]   Accordingly, the government respectfully submits that the Warrants Clause of the Fourth Amendment did not apply to the search in Cambodia of defendant's guesthouse room, and compliance with Cambodian law is sufficient to satisfy the requirements of the Fourth Amendment.

---

[10] Rule 41 of the Federal Rules of Criminal Procedure authorizes magistrate judges to issue a search warrant for a person or property outside the district in three instances, none of which apply here. First, the rule authorizes issuance of a warrant for property outside the district if the property is located within the district when the warrant is issued, "but might move or be moved outside the district before the warrant is executed." Fed. R. Crim. P. 41(b)(2). Second, it authorizes issuance of a warrant for property "within or outside that district" in an investigation of "domestic terrorism or international terrorism," Fed. R. Crim. P. 41(b)(3). Third, it authorizes issuance of a warrant for property outside the jurisdiction of any state or district, but within a United States territory, possession or commonwealth, the premises of a United States diplomatic or consular mission in a foreign state, or a residence owned or leased by the United States and used by United States personnel assigned to a United States diplomatic or consular mission in a foreign state. Fed. R. Crim. P. 41(b)(5). Otherwise, Rule 41 authorizes the issuance of warrants for property "located within the district." Fed. R. Crim. P. 41((b)(1).

1  **B.    The Evidence Was Seized from Defendant's Room at the Tong
2       Mean Guesthouse in Compliance with Cambodian Law**

3       The CNP obtained verbal authorization from the Royal
4  Prosecutor to search defendant's room at the Tong Mean
5  Guesthouse.   This search complied with Article 91 of the
6  Cambodian Code of Criminal Procedure (the "Code").   Article 91
7  provides that a judicial police officer may conduct a search with
8  authorization from the Royal Prosecutor.   (Koeut Decl. ¶ 7).
9  Verbal authorization from the Royal Prosecutor is valid.   (<u>Id.</u>).

10      Article 91 sets forth the search procedure that applies to
11 crimes that are in *flagrante delicto*.   (Koeut Decl. ¶ 7).   The
12 definition of *flagrante delicto* is set forth in Article 86 of the
13 Code.   (<u>Id.</u>).   A crime is in *flagrante delicto* 1) during its
14 commission, 2) immediately after its commission, or 3) shortly
15 after its commission where a suspect is in hot pursuit, or where
16 a person has physical or identifying evidence from which it can
17 be concluded that the suspect committed or participated in a
18 crime.   (<u>Id.</u>).   In this case, defendant's offense on February 19,
19 2009, was in *flagrante delicto*.   Defendant was inside a house
20 known for offering children for sex, in a community known for
21 offering children for sex, with a girl who appeared to be
22 approximately 10 years of age.   Defendant was seen paying money
23 to a girl in front of that house.   When defendant heard that
24 police were approaching, he ran and Officer Sreng chased him in
25 hot pursuit.   The CNP officers believed that defendant had just
26 committed the crime of purchasing child prostitution in a
27 situation in *flagrante delicto*, in violation of Article 34 of the
28 Kingdom of Cambodia Law on Suppression of Human Trafficking and

21

Sexual Exploitation.[11]

Koeut Rith, who is the Undersecretary of State for the Ministry of Justice in Cambodia, and who has expertise on the Code, concluded that based on the totality of all of the facts and circumstances in this case, it is his opinion that the police had the discretion to conclude that a crime had been committed in *flagrante delicto*. (Koeut Decl. ¶ 26).  The CNP had submitted a Request to the Royal Prosecutor to Conduct a Preliminary Investigation, and the rules for preliminary investigations differ from the rules that apply to in *flagrante delicto* situations.  (Koeut Decl. ¶ 4).  However, separate from that preliminary inquiry, the events of February 19, 2009, as set forth in the Declarations of Major Keo Thea, Officer Sreng Hong, and Chan Somphors, and the Report of Temporary Police Custody, permitted the officers to undertake an investigation into the offense that had been committed in *flagrante delicto*. (Koeut Decl. ¶ 26).

Because the offense was in *flagrante delicto*, the CNP had seven days to conduct the investigation.  Under Article 106 of the Code, the investigation of a crime that is in *flagrante*

---

[11]   Article 34, which is entitled "Purchase of Child Prostitution" states:
> A person who has sexual intercourse or other sexual conduct of all kinds with a minor who is 15 years of age or above by providing, or promising to provide, anything of value to the minor, an intermediary, a parent, a guardian or any other person who keeps the child under his or her supervision or control shall be punished with imprisonment from 2 to 5 years.  Any person who commits the above stated offense with a minor under the age of 15 years shall be punished with imprisonment from 7 to 15 years.
(Koeut Decl. ¶ 19).

22

1    *delicto* shall last no more than 7 days from the date of the

2    occurrence of the crime.  (Koeut Decl. ¶ 14).  The search of

3    defendant's room at the Tong Mean took place on February 20,

4    2009, one day after his arrest and well within the seven-day

5    period.  (Koeut Decl. ¶ 27).  Colonel Prum Vutha first obtained

6    the authorization to conduct the search and seizure from the

7    Royal Prosecutor.  Defendant and a representative of the Tong

8    Mean Guesthouse were present.  Based on all of these facts, it is

9    Undersecretary Koeut's opinion that the search and seizure of

10   defendant's property complied with Article 91 of the Code.

11        Undersecretary Koeut also opined that the request by the CNP

12   for ICE assistance in the examination of the digital evidence

13   complied with Cambodian law, specifically Article 95 of the Code.

14   That Article provides that judicial police officers may call on

15   any person who has the requisite expertise if scientific or

16   technological examination is needed and cannot be delayed.  Here,

17   the request complied with Cambodian law.  (Koeut Decl. ¶ 28).

18   **C.   The Evidence is Admissible Even if Cambodian Law Was Not**
     **      Followed Because U.S. Law Enforcement Believed in Good Faith**
19   **      that the Search Complied with Cambodian Law**

20        Even if the search and seizure did not comply fully with

21   Cambodian law, the evidence is still admissible under the good

22   faith exception to the exclusionary rule.  This exception applies

23   if foreign officials do not comply with foreign law.  See Barona,

24   56 F.3d at 1092-93 (citing Peterson, 812 F.2d at 492) ("If

25   foreign law was not complied with, 'the good faith exception to

26   the exclusionary rule becomes part of the analysis.'" ).  Foreign

27   searches "will be upheld" when American officials "reasonably

28   rely on foreign officials' representations of foreign law."

                                   23

1  <u>Juda</u>, 46 F.3d at 968 (citing <u>Peterson</u>, 812 F.2d at 492).

2        The purpose of the exclusionary rule is to deter federal
3  agents from illegal conduct.  <u>See</u> <u>Peterson</u>, 812 F.2d at 491.
4  Recognizing that excluding evidence exacts a high cost on the
5  justice system, the Supreme Court requires domestic police action
6  to be on the level of "deliberate, reckless, or grossly negligent
7  conduct" before triggering the exclusionary rule.  <u>Herring v.</u>
8  <u>United States</u>, 555 U.S. 135, 129 S.Ct. 695, 702 (2009).  The
9  Ninth Circuit extends this rationale to foreign searches because
10 there is no deterrent function in excluding evidence if U.S.
11 officials reasonably believed their actions were legal: holding
12 officers liable "for failings of their foreign associates would
13 be even more incongruous than holding law enforcement officials
14 to a strict liability standard as to the adequacy of domestic
15 warrants."  <u>Peterson</u>, 812 F.2d at 492.  For foreign searches, the
16 good faith exception also serves as a "rational accommodation to
17 the exigencies of foreign investigations."  <u>Id.</u>

18       SA Nguyen believed that the evidence was seized in
19 compliance with Cambodian law.  (Nguyen Decl. ¶ 16).  He came to
20 this belief based in part on the following:  (1) his numerous
21 conversations with Cambodian officials regarding Cambodian law,
22 including members of the CNP and Mr. Suos; (2) his prior
23 experience investigating and assisting the Cambodian government
24 in Cambodia, including experience with Cambodian cases involving
25 searches approved by the prosecutor that were upheld as legal and
26 proper; (3) the behavior and actions of the CNP, including the
27 fact that Lieutenant General Bith Kim Hong, who is the Head of
28 Anti-Human Trafficking and Juvenile Protection in Cambodia, asked

24

for ICE assistance in searching the computer media seized from defendant's room and readily agreed to put that request in writing; and (4) the permission the CNP had obtained from the prosecutor to search defendant's room at the Tong Mean Guesthouse, as SA Nguyen's understanding of Cambodian law is that the prosecutor can authorize such a search.  In fact, Article 91 states that the prosecutor can authorize such a search.

In addition, SA Nguyen attempted to learn Cambodian law, and would not have assisted the CNP if he had any indication that the search and seizure were not in complete compliance with Cambodian law.  Further, he did not view the contents of the digital media that he received from the CNP.  He made a forensic image and shipped that image to the United States, where ICE obtained a federal search warrant and conducted the search.  Likewise, when the Cambodian government later turned over to ICE the original digital evidence seized from defendant's room, ICE obtained a federal search warrant before searching it.

SA Nguyen acted in a good faith belief that Cambodian law was followed.  Even if Cambodian law had not been followed, the exclusionary rule should not apply because the officers "were not in an advantageous position to judge whether the search was lawful, as would have been the case in a domestic setting." Peterson, 812 F.2d at 492; Juda, 46 F.3d at 968 (allowing evidence from a warrantless search when American officials relied on representations that a warrant was unnecessary under Australian law).

25