UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

| Case No. | CR 09-933 CAS | | Date | November 3, 2011 |
|---|---|---|---|---|

| Present: The Honorable | CHRISTINA A. SNYDER, U.S. DISTRICT JUDGE |
|---|---|
| Interpreter | N/A |

| RITA SANCHEZ | N/A | NOT PRESENT |
|---|---|---|
| *Deputy Clerk* | *Court Reporter/Recorder, Tape No.* | *Assistant U.S. Attorney* |

| U.S.A. v. Boyajian: | Present | Cust. | Bond | Attorneys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| N/A | | | | N/A | | | |

| Proceedings: | (In Chambers:) DEFENDANT'S MOTION TO SUPPRESS EVIDENCE (filed 11/23/2010) |
|---|---|

## I.   INTRODUCTION

Defendant Ronald Gerard Boyajian ("Boyajian") is charged with one count of Travel with Intent to Engage in Illicit Sexual Conduct with a Minor in violation of 18 U.S.C. § 2423(b), one count of Engaging in Illicit Sexual Conduct with a Minor in Foreign Places in violation of 18 U.S.C. § 2423 (c), and one count of Commission of a Felony Offense Involving a Minor While Required to Register As Sex Offender pursuant to 18 U.S.C. § 2260(A). See First Superseding Indictment, Dec. 3, 2010. The charges arise from allegations that Boyajian "engaged in sexual conduct in Cambodia with a girl who was under the age of 18, sometime between September 7, 2008 and on or about February 19, 2009." Mot. at 3. "It is further alleged that defendant previously suffered a conviction in California for what is nominally known as 'statutory rape' some fifteen (15) years beforehand, pursuant to California Penal Code Sections 261.5 and 288(a)(b)(1)." Id.

On November 23, 2010, Boyajian filed a motion to suppress evidence seized during a 2009 search of his Cambodian guesthouse room. The government filed its opposition on January 19, 2011, and Boyajian filed his reply on February 3, 2011. After carefully considering the arguments set forth by both parties, the Court finds and concludes as follows.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

**II.    BACKGROUND**

   **A.    Facts Leading Up to and Including the February 19, 2009 Arrest**

Boyajian was arrested in Cambodia on February 19, 2009, as a result of a joint operation between Cambodian and American law enforcement officials, along with an NGO operating in Cambodia, Action Pour Les Enfants ("APLE"), and its agent, Isaac Veth ("Veth"). Mot. at 4, 8, 10. APLE officials, including Chan Somphors, had been investigating Boyajian throughout January and February 2009 because he had been observed frequenting the poor, crime-filled village of Svay Pak. Declaration of Chan Somphors ("Chan Decl.") ¶ 4.[1] Specifically, Boyajian repeatedly went to a blue house that belonged to a woman, Ny, a location known to Investigator Chan as a place where foreigners went to engage in sexual contact with children. Id. On February 12, 2009, Chan observed Boyajian enter Ny's house with Ny, Ny's 13-year-old daughter, and what appeared to be a 10-year-old girl. Id. ¶ 5. Soon thereafter, Ny and her daughter emerged from the house, but the other girl remained inside with Boyajian.

Chan observed a similar situation involving Boyajian and different underage girls on February 19, 2009, the day of the arrest. Chan and police officers, including Cambodian National Police ("CNP") Officer Sreng, approached Ny's house, where Officer Sreng observed Boyajian hand money to one of the several 12- to 13-year-old young girls in the room with him. Declaration of Sreng Hong ("Sreng Decl.") ¶ 5. As the officers prepared to enter the house, Chan heard children yell "police" in Vietnamese, causing Boyajian (and another man in the room with him) to run away. Id. ¶ 6. Officer Sreng chased, caught, and arrested Boyajian. Id. When he returned to Ny's house, Officer Sreng discovered currency on the ground in the vicinity where he had previously observed Boyajian handing money to the girl. Id. ¶ 8.

While Officer Sreng chased Boyajian, his superior, Major Keo Thea, entered Ny's house in an effort to rescue the alleged victims. Declaration of Keo Thea ("Keo Decl.") ¶ 6. Major Keo found no one inside; instead, he discovered a deep hole in the floor, leading Major Keo to conclude that whoever had been inside had escaped through the hole. Id.

APLE Investigator Chan, CNP Officer Sreng, and Major Keo each believed that Boyajian had just paid for child prostitution, in violation of Cambodian law. See Chan Decl. ¶ 11; Sreng Decl. ¶ 9; Keo Decl. ¶ 5. The arrest report filed and signed by CNP Colonel Prum stated that Boyajian was arrested following his unlawful acts with a girl at Ny's house. Declaration of Prum Vutha ("Prum Decl.") Exh. B.

---

[1]In Cambodia, an individual's surname is placed first.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

 B. **The February 20, 2009 Search of Boyajian's Guesthouse and Seizure of Boyajian's Digital Hardware**

 Following Boyajian's arrest, Colonel Prum called Cambodian Deputy Prosecutor Sok Kalyan and requested oral permission pursuant to Article 91 of the Cambodian Code of Criminal Procedure to search Boyajian's guesthouse. Id. ¶ 6, Exh. D. Sok granted permission to search Boyajian's guesthouse, which was thereafter searched by Colonel Prum and other CNP officers. Id. ¶ 8. The following items were seized: one Apple laptop computer; one Nokia telephone; one Canon camera; one memory flas, micro H.C., cash, and a bottle of Scabiderm. Id., Exh. F. At the time of the seizure, the CNP did not employ specialists or possess equipment necessary to inspect and search Boyajian's computer data. Id. ¶ 9. Accordingly, the CNP requested assistance from the U.S.'s Immigrations and Customs Enforcement ("ICE") to examine the materials. Id. ¶ 9, Exh. G. ICE agents thereafter assisted in creating forensic images of Boyajian's laptop's hard drive, his external hard drive, and the memory card found in his camera. Declaration of Hung Nguyen ("Nguyen Decl.") ¶ 12. Nguyen verified that the forensic images he had created were the same as the originals by comparing the data identifiers of the various files. Id. He brought these copies back to California and secured a federal search warrant before examining the actual images he had copied. Id. ¶¶ 13–15.

**III. MOTION TO SUPPRESS**

 Boyajian moves to suppress all evidence seized as a result of his arrest and subsequent search. The Court will analyze each party's contentions in turn.

 A. **Boyajian's Motion**

 Boyajian contends that in connection with the investigation, APLE agent Veth operated as an undercover agent and taped a number of conversations with him. Mot. at 14. Boyajian argues that because the investigation was a joint operation with United States agents, and that because the seizure of evidence was contrary to Cambodian law, the operation violated his Fourth Amendment rights and the seized evidence should not be admitted. Id.

 First, Boyajian contends that Veth entered Boyajian's room at the International Guest House when he was not present and "seized, in addition to other items, all of Boyajian's [digital media devices], including his laptop and other devices" on February 16, 2009 at 11:30 a.m.[2] Id.

---

 [2]In opposition, the government contends that a person known as "I.V." provided free information to APLE regarding suspicious individuals who "had come to Cambodia to engage

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CRIMINAL MINUTES - GENERAL

at 17. Additionally, Boyajian argues that the search of his residence on February 20, 2009 failed to comply with Cambodian law.[3] Id. at 19. Boyajian contends that no arrest warrant was issued in this case. Id. Boyajian further contends that his arrest was not in *flagrante delicto*:

> There is no evidence that, on the evening of Boyajian's arrest of February 19, 2009, he was detained or arrested while committing a crime or immediately after. There is no evidence of 'an object, or a scar, mark or other evidence' was detected or gathered by the combined law enforcement agencies involved, suggesting that he had just recently committed or participated in a crime.

Id. at 20.

Boyajian further argues that the search of his residence was unlawful because "[f]ew of the requirements of Article 113 were complied with, in connection with the search . . . . No

---

in sexual conduct with minors." Opp'n at 13 n. 7. The government contends that I.V. befriended Boyajian, and that Boyajian asked him to "go into his room at the [International Guest House] and retrieve his belongings on February 16, 2009." Id. at 14. According to I.V., Boyajian asked him to do so because he was scared that he was being followed. Id. Consequently, I.V. retrieved the items and delivered them to Boyajian. I.V. did not search the black bag. Declaration of Tim Huon ("Tim Decl.") ¶ 5(b). No one from APLE, the CNP, or any law enforcement agency, told I.V. to search Boyajian's items. Id. ¶ 7; Declaration of I.V. ("I.V. Decl.") ¶ 8. Neither Tim nor anyone from APLE told I.V. to seize or search Boyajian's property. Tim Decl. ¶ 7. Tim did not ask, and I.V. did not tell him, what items I.V. had retrieved for Boyajian. Id.

[3]Boyajian also recounts a number of instances in which he was stopped and searched at airports while traveling:

> All of the records of Boyajian's airport stops memorialize that he was detained due to law "enforcement referrals," likely generated by his passport through TECS or other systems, revealing that he was a registered sex offender, and that he was regularly detained and searched. In all of those searches, however, no child pornography was ever detected. It is inconceivable, therefore, that, in the context of the traffic stop, police escorting him to his guest room for passport identification and his plans to leave the next morning by China Airlines to the United States, that he would have a laptop loaded up with child pornography.

Mot. at 19.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

'express or real approval' was obtained from the occupant of the residence.  No handwritten consent was obtained from the occupant.  Nor was the search personally led by any 'prosecutor.'"  Id. at 21.  Additionally, Boyajian argues that the search failed to comply with the requirements of Article 159, which Boyajian contends states in relevant part:

> An investigating judge may conduct a search.  An investigating judge shall conduct a search in the presence of the occupant of the place.  In the absence of the occupants, the judge shall search in the presence of two witnesses, to be selected by the judge.  The witnesses may not be police or military officers from the force conducting the search.  An investigating judge may not conduct a search before 6:00 a.m. or after 6:00 p.m., except the case of searching: at a place that is open to the public; at a place where drugs are produced stored, circulated, distributed or consumed.  The investigating judge has to establish a written record of the search.  The investigating judge, a clerk and the occupant of the place or the two witnesses shall sign the search report.  The written record shall include the identity of the occupant of the place or the two witnesses.

Id. at 21–22.

Furthermore, Boyajian argues that his actual conduct "on the evening of his arrest did not constitute a 'flagrant' offense subject to the search requirements and conditions for searches involving 'a flagrant felony.'"  Id. at 23.  Specifically, that evening Boyajian "was not in the company of SL or any other minor children [and thus] was not committing or attempting a crime against SL, or anyone else, at the time of his arrest."  Id.

Moreover, Boyajian contends that even if the provisions of Article 91 (applying to flagrant felonies) were applicable, there is no reliable evidence or record that, prior to conducting the search and seizure of Boyajian's room, a qualified "authorization from the Royal Prosecutor" was ever obtained.  Id.  "There is no mention of any 'prosecutor' in Vutha's official report of that search."  Id. at 24.  Boyajian notes, however, that in response to a recent inquiry, the U.S. Attorney's office provided "seemingly conflicting information with Prum Vutha's official report.  On November 12, 2009, defense was provided somewhat illegible photocopies of Khmer notes by Prum Vutha, wherein he may have memorialized reference to verbal authorization for the search by a prosecutor, Sok Kalyan."  Id.  According to Boyajian, "the belated handwritten notes are problematic, because they conflict with the official report by the same author, and raise other questions of authenticity and possible fabrication."  Id.

Boyajian further argues that after Cambodian officials took possession of the digital media devices, they were transferred to American officials, who completed computer forensic images of those items.  Id. at 25.  Boyajian argues that in doing so, " a complete, separate and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

distinct copy of all that ICE agent Nguyen could obtain from the DME was fully seized, extracted and viewed, and a copy maintained by ICE agents." Id. at 26–27. Boyajian contends that ICE agents should have first obtained a search warrant before creating their own copy of the digital materials. Id. at 27.

### B. Government's Opposition

In opposition, the government contends that "the Warrants Clause of the Fourth Amendment did not apply to the search in Cambodia of defendant's guesthouse room, and compliance with Cambodian law is sufficient to satisfy the requirements of the Fourth Amendment." Opp'n at 20. According to the government,

> defendant's offense on February 19, 2009, was in *flagrante delicto*. Defendant was inside a house known for offering children for sex, in a community known for offering children for sex, with a girl who appeared to be approximately 10 years of age. Defendant was seen paying money to a girl in front of that house. When defendant heard that police were approaching, he ran and Officer Sreng chased him in hot pursuit. The CNP [Cambodia National Police] officers believed that defendant had just committed the crime of purchasing child prostitution.

Id. at 21.

Moreover, the government asserts that Koeut Rith, the Undersecretary of State for the Ministry of Justice in Cambodia and who has expertise on the Code, "concluded that based on the totality of all of the facts and circumstances in this case, it is his opinion that the police had the discretion to conclude that a crime had been committed in *flagrante delicto*." Id. at 22. While a preliminary inquiry had been requested, "separate from that preliminary inquiry, the events of February 19, 2009, as set forth in the Declarations of Major Keo Thea, Officer Sreng Hong, and Chan Somphors, and the Report of Temporary Police Custody, permitted the officers to undertake an investigation into the offense that had been committed in *flagrante delicto*." Id.

The government further argues that because the offense was in *flagrante delicto*, the CNP had seven days to complete the investigation pursuant to Article 106 of the Code, and therefore they were authorized to search Boyajian's residence one day later. Id. at 22–23. "The search of defendant's room at the Tong Mean took place on February 20, 2009, one day after his arrest . . . Colonel Plrum Vutha first obtained the authorization to conduct the search and seizure from the Royal Prosecutor. Defendant and a representative of the Tong Mean Guesthouse were present." Based on all of these facts, Undersecretary Koeut opined that seizure of Boyajian's property complied with Article 91 of the Code and also contended that the request by the CNP

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CRIMINAL MINUTES - GENERAL

for ICE assistance in the examination of the digital evidence complied with Cambodian law, specifically Article 95 of the Code. Id. at 23. "That Article provides that judicial police officers may call on any person who has the requisite expertise if scientific of technological examination is needed and cannot be delayed." Id.

Even if the seizure was not in compliance with Cambodian law, the government argues it should be admitted under the good faith exception to the warrant requirement. Id. at 24. The government asserts:

> SA Nguyen believed that the evidence was seized in compliance with Cambodian law. (Nguyen Decl. ¶ 16). He came to this belief based in part on the following: (1) his numerous conversations with Cambodian officials regarding Cambodian law, including members of the CNP and Mr. Suos; (2) his prior experience investigating and assisting the Cambodian government in Cambodia, including experience with Cambodian cases involving searches approved by the prosecutor that were upheld as legal and proper; (3) the behavior and actions of the CNP, including the fact that Lieutenant General Bith Kim Hong, who is the Head of Anti-Human Trafficking and Juvenile Protection in Cambodia, asked for ICE assistance in searching the computer media seized from defendant's room and readily agreed to put that request in writing; and (4) the permission the CNP had obtained from the prosecutor to search defendant's room at the Tong Mean Guesthouse, as SA Nguyen's understanding of Cambodian law is that the prosecutor can authorize such a search.

Id. at 24–25.

  C. Analysis

    1. Applying the Fourth Amendment to Searches Abroad

It is a "general and undisputed proposition[]" that "neither our Fourth Amendment nor the judicially created exclusionary rule applies to acts of foreign officials." United States v. Barona, 56 F.3d 1087, 1090–91 (9th Cir. 1995) (internal alterations, quotation marks, and citations omitted). Thus, courts generally admit evidence seized by foreign officials in their own countries, regardless whether the search complied with the Fourth Amendment. See id.; see also United States v. LaChapelle, 869 F.2d 488, 489 (9th Cir. 1989); United States v. Maher, 645 F.2d 789, 782–83 (9th Cir. 1981); Stonehill v. United States, 405 F.2d 738, 743 (9th Cir. 1968). Two "very limited exceptions" apply to the general rule that courts will automatically admit such evidence. Barona, 56 F.3d at 1091 (internal quotation marks and citation omitted). The first occurs "if the circumstances of the foreign search and seizure are so

extreme that they shock the judicial conscience, so that a federal appellate court in the exercise of its supervisory powers can require exclusion of the evidence." Id. (internal quotation marks and citation omitted). The Court finds that the circumstances of this case do not "shock the judicial conscience."

The second exception applies when "United States agents' participation in the investigation is so substantial that the action is a joint venture between [the] United States and foreign officials." Id. (internal quotation marks and citation omitted). The government acknowledges, and the Court finds, that ICE's aid of CNP's investigation into Boyajian was "sufficient to trigger the joint venture exception to the rule set forth in Barona." Opp'n at 17. Thus, in joint venture cases, the reasonableness of the search is measured by compliance with foreign law. See United States v. Juda, 46 F.3d 961, 968 (9th Cir. 1995) ("[A] foreign search is reasonable if it conforms to the requirements of foreign law."). As the Ninth Circuit set forth in Barona, "compliance with foreign law alone determines whether the search violated the Fourth Amendment." 56 F.3d at 1093 n.1.[4]

The Court must therefore determine whether the search at issue complied with Cambodian law so as to meet the reasonableness requirement of the Fourth Amendment.

## 2. Whether the Search Complied With Cambodian Law

Pursuant to Article 86 of the Cambodian Code of Criminal Procedure, a crime is in

---

[4] The Court rejects Boyajian's contention that the government must separately comply with the Fourth Amendment's warrant requirement. Although there are no controlling cases directly on point, several courts have indicated that the warrant requirement does not, and in fact could not, apply to overseas searches by U.S. or foreign officials. See, e.g., Barona, 56 F.3d at 1092 n.1 ("[F]oreign searches have neither been historically subject to the warrant procedure, nor could they be as a practical matter."); United States v. Verdugo-Urguidez, 494 U.S. 259, 274 (1990) (noting that a search warrant issued in the U.S. to search a foreign country would be "dead letter outside the United States"); In re Terrorist Bombings of the U.S. Embassies in East Africa, United States v. Odeh, 552 F.3d 157, 167 (2d Cir. 2008) (holding that the Fourth Amendment's warrant requirement does not govern searches conducted abroad by U.S. agents, and noting that "seven justices of the Supreme Court [in Verdugo-Urguidez] endorsed the view that U.S. courts are not empowered to issue warrants for foreign searches"). Accordingly, the Court finds that the search must only comply with the reasonableness requirement of the Fourth Amendment, which, in this instance, equates to compliance with Cambodian law.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CRIMINAL MINUTES - GENERAL

*flagrante delicto* if it (1) is currently being committed; (2) has just been committed; or (3) shortly after its commission where officers are in hot pursuit of a suspect, or where a person has physical or identifying evidence establishing that person's participation in a crime. Declaration of Koeut Rith ("Koeut Decl.") ¶ 7. Here, CNP officers observed Boyajian inside a house known for offering children for sex with a girl approximately 10 years old. Boyajian was seen paying money to a girl in front of that house. When Boyajian realized police were approaching, he ran. Officer Streng chased him in hot pursuit, believing Boyajian had violated Article 34 Cambodian law on Suppression of Human Trafficking and Sexual Exploitation. Based on these circumstances, the Court agrees with Undersecretary Koeut Rith that the CNP officers had discretion to determine that Boyajian had committed a crime in *flagrante delicto*. Id. ¶ 26.

Article 91 permits a judicial police officer to conduct a search with authorization—verbal or otherwise—from the Cambodian Royal Prosecutor. Koeut Decl. ¶ 7. Here, Colonel Prum Vutha obtained verbal authorization from the Royal Prosecutor to search Boyajian's guesthouse following the CNP officers' belief that Boyajian had committed a crime in *flagrante delicto*. Declaration of Prum Vutha ("Vutha Decl") ¶¶ 4, 6. Article 106 sets forth the search procedure that applies to in *flagrante delicto* crimes, requiring officers to complete their investigation (including any searches) within seven days from the date the crime allegedly occurred. Koeut Decl. ¶ 14. CNP officers conducted the search of Boyajian's guesthouse one day after his arrest within the seven-day period. Id. ¶ 27.

Thus, in light of all these factors, the Court concludes that the CNP's search of Boyajian's guesthouse complied with Article 91, and therefore satisfied the Fourth Amendment's reasonableness requirement.[5] Because the search and seizure were lawfully and reasonably conducted, any subsequent actions by ICE with relation to the seized items were not tainted.

## IV. CONCLUSION

In accordance with the foregoing, Boyajian's motion to suppress is DENIED. Because the Court concludes that the search complied with Cambodian law, it need not reach the good faith exception to the exclusionary rule.

---

[5] Moreover, the CNP's request for ICE's assistance in examining the seized digital devices complied with Article 95. Article 95 authorizes judicial police officers to seek assistance from any person who has the requisite expertise for scientific or technological examination is needed and cannot be delayed. Koeut Decl. ¶ 28.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

# CRIMINAL MINUTES - GENERAL

IT IS SO ORDERED.

|  | 00 | : | 00 |
|---|---|---|---|
| Initials of Deputy Clerk | RS | | |