## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

O

## CRIMINAL MINUTES - GENERAL

| Case No. | CR 09-933(A) CAS | | Date | August 14, 2013 |
|---|---|---|---|---|
| Present: The Honorable | CHRISTINA A. SNYDER | | | |
| Interpreter | N/A | | | |

| Catherine M. Jeang | Not Present | Patricia Donahue, Not Present<br>David Herzog, Not Present<br>Kim Meyer, Not Present |
|---|---|---|
| *Deputy Clerk* | *Court Reporter/Recorder, Tape No.* | *Assistant U.S. Attorney* |

| U.S.A. v. Boyajian: | Present | Cust. | Bond | Attorneys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| RONALD GERARD BOYAJIAN | NOT | X | | ANNE HWANG, DFPD<br>ALICIA BLANCO, DFPD | NOT<br>NOT | X<br>X | |

**Proceedings:**

(IN CHAMBERS): DEFENDANT'S MOTION IN LIMINE TO PRECLUDE EVIDENCE OF ENCRYPTION (Docket #241, filed September 25, 2012)

DEFENDANT'S MOTION IN LIMINE TO EXCLUDE REFERENCE TO SEX REGISTRATION AND BIFURCATE COUNT THREE (Docket #242, filed September 25, 2012)

DEFENDANT'S MOTION IN LIMINE TO PRECLUDE TAPE-RECORDED CONVERSATIONS (Docket #243, filed September 25, 2012)

GOVERNMENT'S MOTION IN LIMINE TO PRECLUDE IMPROPER IMPEACHMENT (Docket #289, filed November 26, 2012)

DEFENDANT'S MOTION IN LIMINE TO PRECLUDE (1) FLASH DRIVE, AND (2) GIFT CD (Docket #300, filed January 9, 2013)

DEFENDANT'S MOTION IN LIMINE TO EXCLUDE TESTIMONY OF GOVERNMENT WITNESSES WENDY FREED AND PETER COLLINS (Docket #303, filed January 14, 2013)

## I.    INTRODUCTION

Defendant Ronald Gerard Boyajian is charged with one count of Travel with Intent to Engage in Illicit Sexual Conduct with a Minor in violation of 18 U.S.C. § 2423(b), one count of Engaging in Illicit Sexual Conduct with a Minor in Foreign Places in violation of 18 U.S.C. § 2423 (c), and one count of Commission of a Felony Offense Involving a Minor While Required to Register As Sex Offender pursuant to 18 U.S.C. § 2260A. See First Superseding Indictment,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

◯

**CRIMINAL MINUTES - GENERAL**

Dec. 3, 2010. The charges arise from defendant's alleged illicit sexual acts with a minor girl in Cambodia, identified as S.L.  Further background and facts are known to the parties and set forth in the Court's orders dated November 3, 2011; July 6, 2011; September 17, 2012; and October 9, 2012. Dkt. #254, 237, 127, 111.

Defendant has filed motions in limine seeking to exclude expert testimony, evidence that defendant encrypted child pornography, surreptitiously recorded conversations between defendant and an informant, a CD containing child pornography that defendant gave to the same informant, and evidence that defendant was required to register as a sex offender during the time he allegedly commit the acts charged in the indictment.  Additionally, the government has filed a motion in limine seeking to limit the cross-examination of confidential witnesses it intends to introduce at trial.  After considering the parties' motions, oppositions, and replies, the Court finds and concludes as follows.

## II.   DEFENDANT'S MOTION TO PRECLUDE ENCRYPTION EVIDENCE

The government seeks to introduce evidence that defendant used encryption techniques to conceal child pornography files on his laptop computer.  Defendant's encryption program, called "TrueCrypt," has prevented the government from opening the files to verify their contents.  Nonetheless, the government has presented evidence supporting a reasonable inference that at least some of the encrypted files are child pornography.  Specifically, the government's expert claims that when defendant's QuickTime video viewing software was used to open a file that had been encrypted by TrueCrypt, the QuickTime software recorded the name of the video and also registered "additional data" indicating that the video had been encrypted by TrueCrypt.  The government's expert searched defendant's computer and found data registered by QuickTime showing that files with the same name as child pornography files recovered from other parts of defendant's computer were encrypted and played using Quicktime.

According to defendant, the encryption evidence is not relevant.  Defendant admits that, in principle, evidence of encryption—like evidence of flight or concealment—can be relevant to demonstrate consciousness of guilt.  United States v. Jaramillo-Suarez, 950 F.2d 1378, 1384 – 85 (9th Cir. 1991); United States v. Harris, 792 F.2d 866 (9th Cir. 1986).  Like evidence of flight or concealment, however, defendant argues that encryption evidence only demonstrates consciousness of guilt if there is evidence showing that the encryption took place when defendant knew he was suspected of the charged crimes and took place soon before or after the commission of the crimes.  United States v. Harrison, 585 F.3d 1155, 1159 – 60 (9th Cir. 2009); United States v. Blanco, 392 F.3d 382, 395 (9th Cir. 2004).  Here, defendant argues that the government has no such evidence.  Specifically, defendant points out that the government has

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

○

**CRIMINAL MINUTES - GENERAL**

no evidence regarding when the encryption took place, and hence cannot provide evidence demonstrating the requisite temporal link between the encryption and the charged conduct. Defendant concludes that without proof of the required temporal link, the encryption evidence cannot be used to prove consciousness of guilt, and should therefore be excluded as irrelevant. See United States v. Peeters, Case No. 09-CR-00932, Dkt. 144 at 3 (excluding evidence that computer files were encrypted without a temporal link between the charged conduct and act of encryption); United States v. Heller, 2010 WL 4961661, 7 – 8 (E.D. Va. 2010) (requiring close connection between charged conduct related to child pornography and act of erasing data from a computer hard drive before allowing evidence of blank hard drive to demonstrate consciousness of guilt).

The Court agrees that the encryption evidence cannot be admitted to prove consciousness of guilt. Without a temporal link between the encryption and the charged crimes, the encryption could have occurred for reasons that have nothing to do with current charges. In itself, the encryption does not show an attempt to hide evidence of the crimes with which defendant has been charged. It only shows that defendant was attempting to hide the child pornography, either because child pornography is illegal to possess in many jurisdictions, or for some other reason. See United States v. Silverman, 861 F.2d 571, 581 (9th Cir. 1988) (observing that evidence of flight and concealment can be consistent with "guilt of misconduct unknown to the government."). Therefore, without the requisite temporal link, or without other evidence providing a logical connection between the acts of encryption and the crimes charged, the encryption evidence cannot be introduced to prove consciousness of guilt.

The government explains, however, that the encryption evidence is not rendered irrelevant merely because it cannot be admitted to prove consciousness of guilt. Instead, the government explains that the encryption evidence is also relevant to prove the intensity of defendant's interest in child pornography. The government connects defendant's interest in child pornography with the encryption evidence through the following inferences. First, the government argues that defendant knew that his computer media was subject to search whenever he crossed a border, and further knew that he faced criminal charges if child pornography was found on his computer. The government further explains that despite this risk, defendant did not cease storing child pornography on his computer, but instead encrypted the child pornography. The government concludes that because defendant chose to encrypt the files rather than abandon them in response to the risk of a border search, this shows that defendant has an especially strong interest in child pornography.

The Court finds that while the encryption evidence meets the test for relevant evidence, it should be excluded pursuant to Rule 403. Fed. R. Evid. 401, 403. Under the Federal Rules of Evidence, evidence is relevant if "it has any tendency to make a fact more or less probable than

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

◯

**CRIMINAL MINUTES - GENERAL**

it would be without the evidence," and "the fact is of consequence in determining the action." Fed. R. Evid. 401.  Here, under the reasoning set out by the government, the fact that defendant encrypted his child pornography files rather than simply abandoning them does tend to prove a high degree of interest in child pornography.  By spending time and effort learning about encryption software, and by taking the risk that the child pornography would be found despite the encryption, defendant has revealed facts about the intensity of his interest in child pornography.  Additionally, whether defendant is interested in child pornography is a material fact because, as explained in the Court's previous order, defendant's interest in child pornography tends to show that he traveled with the intent to solicit sex from minors.  Dkt. #237 at 27 – 28.

Pursuant to Federal Rule of Evidence 403, the Court should nonetheless exclude this evidence if its probative value is "substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  When applying Rule 403, the probative value of a piece of evidence "may be calculated by comparing evidentiary alternatives," and the Court should take into account "the full evidentiary context of the case." Old Chief v. United States, 519 U.S. 172, 182 – 184 (1997); see also United States v. Awadallah, 436 F.3d 125, 132 (2d Cir. 2006) ("Probative value is also informed by the availability of alternative means to present similar evidence.").

Here, the probative value of the encryption evidence is limited because the Court's prior orders have already allowed the government to admit actual child pornography possessed by defendant, in addition to numerous other images depicting children's feet and legs, in order to demonstrate defendant's interest in child pornography.  Consequently, because a substantial amount of other evidence will be admitted to prove defendant's interest in child pornography, the encryption evidence has limited probative value when introduced to supply additional evidence of defendant's interest in child pornography.

Weighed against this limited probative value, there is substantial unfair prejudice that defendant will face if the encryption evidence is admitted.  The encryption evidence falls under the category of "extrinsic acts evidence," which "is not looked upon with favor."  United States v. Hodges, 770 F.2d 1475, 1479 (9th Cir. 1985).  This kind of evidence is disfavored because a defendant should not be convicted on the basis of "a showing that the defendant has engaged in other acts of wrongdoing."  Id.  Moreover, extrinsic acts evidence is disfavored if it has a tendency to show that a defendant has an immoral, evil, or repugnant character.  See United States v. Carillo, 981 F.2d 772, 774 (5th Cir. 1993).  When this form of character evidence is introduced, there is a risk that a jury will convict a defendant "for who he is," not for the conduct for which he was indicted.  Hodges, 770 F.2d at 1479.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

○

**CRIMINAL MINUTES - GENERAL**

Extrinsic acts evidence that tends to prove a repugnant character is unfairly prejudicial to defendant because it can lead the jury to a conviction through at least two distinct forms of improper reasoning.  First, character evidence can be improperly used as propensity evidence, which occurs when it leads a jury to conclude that defendant actually committed the crimes charged in the indictment.  Described generally, the improper propensity inference reasons that because the defendant has a bad moral character, the defendant acted in conformity with that character and is hence more likely to have committed the charged crimes.  See, e.g., The New Wigmore: A Treatise on Evidence: Evidence of Other Misconduct and Similar Events, § 1.3 The Character Evidence Rule: Scope.  Rule 404 generally prevents evidence from being introduced to support this form of reasoning.  Fed. R. Evid. 404(a)(1).

Second, character evidence can also be unfairly prejudicial if it leads the jury to a conviction based not on a determination that defendant actually committed the charged conduct, but instead on moral opprobrium directed towards the defendant's bad character.  Carillo, 981 F.2d at 774 ("Character evidence is not excluded because it has no probative value, but because it sometimes may lead a jury to convict the accused on the ground of bad character deserving punishment regardless of guilt.").  This form of improper reasoning is distinct from improper propensity reasoning.  When character evidence leads to a conviction based on moral condemnation, it tends to lead a jury to convict the defendant irrespective of actual guilt for the crimes charged, whereas when character evidence is used as propensity evidence, it instead suggests an improper basis for finding that defendant commit the charged crimes.

The encryption evidence carries with it a substantial risk of unfair prejudice to defendant because it tends to prove a character for dishonesty and disrespect for the law, which could lead the jury to convict defendant even if it harbors doubts about whether he commit the charged conduct.  United States v. Newsom, 452 F.3d 593, 603 (6th Cir. 2006) (evidence is unfairly prejudicial if it suggests to the jury that defendant has a "hostile, criminal disposition").  The fact that defendant not only possessed child pornography, but also took careful, calculated steps to hide it, suggests that he has a character for secretively flouting rules and social norms.  While evidence that defendant possesses this character trait would be damaging in any prosecution, it is especially damaging here where defendant is accused of deviant sexual conduct.  Under the circumstances, there is a substantial danger that a jury would convict defendant based on a belief that defendant lacks respect for the norms of society, sexual or otherwise, not because he was guilty of the conduct charged in his indictment.[1]  Moreover, the risk that the jury will use

---

[1] This is not to say that any evidence tending to prove defendant's character for dishonesty and disrespect for the law should be excluded pursuant to Rule 403.  Rule 403 only provides a reason to exclude the encryption evidence because, as explained above, its probative

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CRIMINAL MINUTES - GENERAL**

the encryption evidence to reach a conviction on an improper basis is particularly strong here, because the material encrypted is child pornography, which courts have recognized as unusually inflammatory evidence that can lead a jury to a conviction regardless of factual guilt.  United States v. Loughry, 660 F.3d 965, 972 (7th Cir. 2011); United States v. Cunningham, 694 F.3d 372, 390 – 391 (3d. Cir. 2012).

The probative value of the encryption evidence is therefore substantially outweighed by the danger of unfair prejudice, and should therefore be excluded pursuant to Rule 403. Additionally, there are other reasons tending to suggest that the encryption evidence should be excluded pursuant to Rule 403.  First, this evidence tends to confuse the issues in this case. Here, defendant has not been charged with possession of child pornography.  Instead, child pornography is admissible to demonstrate his sexual interest in prepubescent girls, and hence can be admitted to prove his intent, motive, and plan to commit the crimes charged in this case. However, evidence focusing on details regarding defendant's possession of child pornography tends to obfuscate what role child pornography plays in this case because it suggests that his guilt or innocence directly turns on whether he knowingly possessed child pornography, not that the child pornography evidence is only relevant to prove intent, motive, and plan.

Second, the encryption evidence should be excluded because there is a risk that it will lead to undue delay.  As mentioned above, the government is unable to open the encrypted files found on defendant's computer, and hence must rely on indirect inferences to prove that the files actually contain child pornography.  Both parties have submitted complex, technical expert reports discussing whether the government can actually prove that these files contain child pornography.  Due to the slight probative value of the encryption evidence, the lengthy presentation of this technical evidence would lead to undue delay.

Therefore, pursuant to Federal Rule of Evidence 403, the Court finds that the probative value of the encryption evidence is substantially outweighed by the danger of unfair prejudice, confusing the issues, and undue delay.  Without evidence connecting the encryption of the child pornography to the crimes charged in the indictment, the connection between the encryption evidence and the crimes charged is simply too attenuated to be admitted under Rule 403. Accordingly, defendant's motion in limine to exclude the encryption evidence should be granted.

---

value is slight, and hence is substantially outweighed by the risk that it will lead to a conviction on improper grounds.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CRIMINAL MINUTES - GENERAL**

## III.  DEFENDANT'S MOTION TO PRECLUDE REFERENCE TO SEX REGISTRATION

### A.  Background

Defendant is required to register as a sex offender due to prior convictions in Orange County Superior Court.  The government seeks to introduce evidence that defendant was required to register as a sex offender at the time of his travel to Cambodia.  While defendant admits that this evidence is relevant to count three, defendant asks the Court to bifurcate the trial of count three and not allow evidence of his status as a sex offender registrant to be admitted in the trial of counts one and two.

While the Court has never considered the admissibility of evidence showing that defendant was required to register as a sex offender, the Court's September 17, 2012 order addressed the admissibility of the criminal acts that ultimately gave rise to the requirement that he register as a sex offender.  There, the Court found that the facts underlying defendant's earlier sex offense convictions were admissible pursuant to Federal Rule of Evidence 404(b) because they demonstrated defendant's modus operandi and because they were relevant to defendant's intent. Dkt. #237, 11 – 13.  The Court also found that live testimony from the victims in those cases would be admissible to explain the facts underlying the convictions.

### B.  Analysis

Defendant argues his status as a sex offender registrant is not admissible under Federal Rule of Evidence 404(b).  The government disagrees, arguing that this evidence is admissible because, under the Court's prior ruling, evidence that defendant was convicted of sex crimes is admissible.  Therefore, because defendant became a sex offender registrant as a consequence of these acts, this evidence can be admitted during the trial of counts one and two and there is no need to bifurcate trial.

Defendant makes two arguments in response.  First, citing <u>United States v. Mason</u>, 2012 WL 380325 (E.D.N.C. 2012), defendant argues that Rule 404(b) does not render evidence of defendant's registration requirement admissible because Rule 404(b) only applies to "[e]vidence of a crime, wrong, or other act," and evidence of defendant's registration requirement is evidence of a status.  Second, defendant argues that the Court's earlier ruling only addressed the admissibility of evidence concerning the criminal acts underlying his prior convictions, but not evidence of the convictions themselves.  Moreover, defendant contends that the reasoning underlying the Court's prior order does not extend to admitting evidence of the convictions themselves.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CRIMINAL MINUTES - GENERAL**

The Court finds that defendants' status as a sex offender registrant need not be excluded. As the government points out, this evidence has probative value for demonstrating the reason why defendant traveled to Cambodia. Defendant's status as a sex offender registrant made it more difficult to approach minors in California, and therefore defendant traveled abroad in order to avoid the restrictive effects of this status. Moreover, defendant's reasons for traveling to Cambodia are relevant to counts one and two, and therefore there is no need to bifurcate the trial.

Defendant's arguments provide insufficient grounds for excluding this evidence. First, even though the evidence concerns defendant's "status" as a sex offender, and not "a crime, wrong, or other act," at best this shows that the evidence is outside the scope of Rule 404(b). It fails to explain why evidence of defendant's sex offender registrant status is inadmissible if it is relevant and consistent with the other rules of evidence. See United States v. Mitchell, 172 F.3d 1104, 1107 – 08 (9th Cir. 1999) (an individual's state of impoverishment is not a crime, wrong, or other act within the meaning of Rule 404(b), but can still be admitted if it is relevant and its admission is consistent with Rule 403).

As explained above, the government has proffered the evidence for a relevant purpose, and the only other ground for excluding the evidence offered by defendant is that it carries the danger of unfair prejudice. Fed. R. Evid. 403. Weighing the probative value and danger of unfair prejudice in the context of the other evidence proffered in this case, however, the Court finds that the evidence should not be excluded. As discussed above, evidence concerning the crimes that led to defendant's sex offender registrant status are admissible. Therefore, the marginal danger of unfair prejudice caused by admitting the sex offender registrant evidence is slight. Moreover, as explained above, the government has given a cogent explanation regarding how the sex offender registrant evidence demonstrates defendant's intent and motive for traveling to Cambodia. Rule 403 accordingly does not provide grounds for excluding this evidence.

///

///

///

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

$\bigcirc$

**CRIMINAL MINUTES - GENERAL**

## IV.  DEFENDANT'S MOTION TO PRECLUDE TAPE-RECORDED CONVERSATIONS AND THE GIFT CD

### A.   Background

Defendant seeks to preclude three tape-recorded conversations between defendant and Isaac Veth ("Veth") that took place on February 16, 17, and 18, 2009.[2]  These conversations were recorded surreptitiously by Veth using equipment provided by United States Immigration and Customs Enforcement ("ICE").

When the February 18, 2009 conversation took place, defendant suspected that a non-governmental organization was investigating him for soliciting sex from children, and he spoke to Veth about what circumstances could have led to the investigation.  In the course of this conversation, defendant and Veth discuss a CD that defendant had given to Veth roughly one week earlier.  The CD was labeled with the word "Babysex."  Although Veth did not view the CD, Veth gave the disk to ICE agents, who discovered that it contained three child pornography videos.  The government does not seek to show the contents of the CD to the jury, nor does it seek to introduce the CD's label, but instead seeks to introduce the following portion of the conversation between defendant and the informant.

| | |
|---|---|
| **BOYAJIAN:** | So, one option[3] is when I spoke to somebody and they passed the information along. |
| **INFORMANT:** | Yeah. |
| **BOYAJIAN:** | The other option is shit like going online to pornography sites and downloading pornography, child pornography or something or. |
| **INFORMANT:** | Well I, I. |
| **BOYAJIAN:** | See it's something.  It's a chat room where. |
| **INFORMANT:** | See I don't think, I think the, the shit you gave me was fucking old, so I don't think it [would] even matter, would it? |
| **BOYAJIAN:** | Oh that's fucking child pornography. |

---

[2] Defendant's original motion in limine also sought to preclude two other tape recorded conversations that took place on December 27, 2008 and January 21, 2009.  In his reply brief, however, defendant withdrew his motion with respect to these conversations.  Dkt. #315 at 1 n.1.

[3] Defendant referred to the various explanations regarding why he was being investigated as "options."

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

○

**CRIMINAL MINUTES - GENERAL**

| **INFORMANT:** | So, it's fucking old. |
|---|---|
| **BOYAJIAN:** | You didn't see those scenes on child pornography? |
| **INFORMANT:** | Yeah, I, I saw all that.[4] |

**B.   Analysis**

Defendant seeks to exclude the tape-recorded conversations on the grounds that they were recorded in violation of Cambodian law.  The government and defendant agree that Cambodian law applies to determine the admissibility of the tape-recorded evidence,[5] and have each submitted declarations from Cambodian law experts concerning the admissibility of the evidence, and both experts testified at an evidentiary hearing on February 22, 2013.

The government's expert, Koeut Rith ("Rith"), is the Under Secretary of State for the Ministry of Justice of the Kingdom of Cambodia.  Rith explains that under Article 321 of the Code of Criminal Procedure of the Kingdom of Cambodia ("CCP"), "[u]nless it is provided otherwise by law, in criminal cases all evidence is admissible."  Rith Decl. ¶ 3a.  Additionally, Rith states that prior to December 11, 2010, the portion of the CCP applicable to conduct within Phnom Penh contained no provision prohibiting nonconsensual audio or visual recording of a face to face conversation.  Rith Decl. ¶ 4.  Therefore, Rith concludes that because the tape-recordings did not violate any specific provision of the CCP, they are admissible in a criminal case under Cambodian law.  Rith Decl. ¶ 5.

Defendant's expert, Sok Sam Oeun ("Oeun"), is a Cambodian attorney and the Executive Director of the Cambodian Defenders Project, a non-governmental organization that provides legal services in Cambodia.  Oeun agrees with Rith that evidence is admissible in a criminal case under Article 321 unless there is a law providing otherwise.  Oeun disagrees, however, that no provision of Cambodian law forbids non-consensual recordings.  In particular, Oeun points to Articles 40(3) & (4) of the Cambodian Constitution, which state that, "the right to privacy of

---

[4] The government also seeks to introduce portions of the conversation between defendant and Veth where the two discuss techniques for encryption.  In light of the Court's finding that evidence of encryption is not admissible pursuant to Rule 403, this portion of the conversation is not admissible.

[5] In the Court's order dated November 3, 2011, Dkt. #127, the Court found that the investigation of defendant in Cambodia was a "joint venture" between United States officers and Cambodian officers, and therefore that evidence recovered after searches conducted in Cambodia is only admissible if the searches complied with Cambodian law.  See Dkt. # 127 at 7 – 8 (discussing United States v. Barona, 56 F.3d 1087 (9th Cir. 1995).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

○

**CRIMINAL MINUTES - GENERAL**

residence and to the secrecy of correspondence by mail, telegram, fax, telex, and telephone shall be guaranteed," and that "[a]ny search of the house, material and body shall be in accordance with the law." Oeun Decl. ¶ 4a – b. While these provisions do not, on their face, state that it is unlawful to surreptitiously record a conversation, Oeun argues that they should be so interpreted in light of the provisions of the CCP related to recording telecommunications. The telecommunications provisions of the CCP prevent a "judicial police officer" from secretly intercepting telecommunications unless he or she obtains permission from an "investigating judge." Oeun Decl. ¶ 4e – f.[6] Reading these provisions together, Oeun concludes that Cambodian law only allows surreptitiously recorded conversations to be admitted in a criminal case if they are created pursuant to a court order.

Defendant also argues that Rith's position that no warrant was required prior to recording the conversation is inconsistent with his testimony in United States v. Michael James Dodd, CR 10-235 JFW ("Dodd"). In Dodd, Rith submitted a declaration stating that audio and video surveillance in a residence was acceptable only with a warrant. Rith Dodd Decl., Dkt. 315 Ex. A, ¶ 18.

After considering the testimony submitted by Oeun and Rith, the Court finds that at the time the recordings were made, they were not unlawful under any provision of Cambodian law. Oeun points to no provision of Cambodian law that, in February 2009, specifically prohibited an individual from recording his or her conversations with others. Instead, the provisions Oeun points to all focus on different kinds of recordings or eavesdropping. Articles 105 and 172, for example, both focus on telephone conversations or telerecordings. Moreover, Article 40(3) of the Cambodian Constitution, upon which Oeun also relies, the "secrecy of correspondence by mail, telegram, fax, telex, and telephone;" it does not reach recordings of face to face conversations, and does not guarantee that all such conversations will be secret or private.

---

[6] The relevant provisions of the CCP pointed to by Oeun state, in full:

"Judicial police officers have no authority to order any person to secretly listen to or record any telephone conversation. They have no authority to intercept or record any correspondences by telecommunication, such as facsimiles or email messages." Art. 105 CCP.

"For the purpose of ascertaining the truth, the investigating judge may issue an order authorizing the listening to and recording of telephone conversation and all other telecommunications, such as by facsimile or email." Art. 172 CCP.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CRIMINAL MINUTES - GENERAL**

Moreover, the fact that some of the recordings were made in defendant's Cambodian residence does not alter the Court's analysis.  It is true, as Oeun points out, that the Cambodian Constitution guarantees the "right to privacy of residence."  Here, however, no facts show that the recordings were created in violation of defendant's right of privacy in his residence.  Instead, as Rith testified, no infringement upon the right of defendant's privacy in his residence occurred because Veth entered defendant's residence with defendant's consent.  Moreover, as Rith further testified, Veth's recording of the conversations in this residence did not amount to an additional invasion of privacy because the conversations were consensual, and Veth was free to report the content of the conversations to law enforcement.  Rith reasoned that because Veth was free to report these conversations to law enforcement, no additional invasion of privacy occurred in recording the conversations and providing law enforcement with the recording.[7]

Consequently, because defendant has not pointed the Court to any Cambodian legal authority prohibiting a party from recording face-to-face conversations, the Court finds that Veth's recordings did not violate Cambodian law.

Additionally, Rith's testimony in <u>Dodd</u> does not appear inconsistent with his testimony in the instant case.  In <u>Dodd</u>, law enforcement officers were seeking to install monitoring equipment in a suspect's residence, and Rith's testimony stated that under those circumstances, a warrant was necessary.  This conclusion is consistent with the portion of Cambodian law set out in Oeun and Rith's declarations in this case.  In particular, the circumstances here are different than those in <u>Dodd</u> because Veth's entry into defendant's resident was with defendant's consent, and therefore, as noted above, there was no intrusion upon the privacy of defendant's residence.  Therefore, Rith's testimony in <u>Dodd</u> is consistent with his testimony here, and provides no grounds for doubting his conclusions.[8]

---

[7] This result is in accordance with analogous law in the United States.  <u>See</u> <u>United States v. White</u>, 401 U.S. 745, 751 (1971).

[8] Defendant also argues that General Bith Kim Hong, a high ranking officer in the Cambodian National Police, informed ICE during a meeting that a warrant was required prior to surreptitiously recording a conversation.  <u>See</u> Dkt. 243 Exs. A – B.  As the government points out, this may only reflect the practices of the Cambodian police, not legal requirements.  In any event, Hong's vague opinion does not provide grounds for doubting the conclusions the Court reached after reviewing each party's Cambodian law expert.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CRIMINAL MINUTES - GENERAL**

**C.   Admissibility of the Portion of the Conversations Discussing the CD**

Although Cambodian law does not provide grounds for excluding the entire transcript, any portion of the transcript the government seeks to use must nonetheless be admissible under the Federal Rules of Evidence.  Here, defendant contends that the portion of the transcript quoted above in which Veth and defendant discuss the CD is not relevant to the crimes charged. Defendant recognizes that the Court has previously held that child pornography found on defendant's computer is admissible to prove defendant's intent, purpose, and plan to travel to Cambodia to have sex with children, but contends that the discussion about the CD is not admissible under this rationale.  Defendant argues that, at best, this portion of the transcript shows that Veth obtained child pornography from defendant and acted as if he liked it. Moreover, defendant argues that introducing the portion of the transcript discussing the CD would disparage defendant's character, and therefore that this evidence should be dismissed pursuant to Rule 403.

In response, the government argues that this evidence is relevant because it demonstrates defendant's access to and interest in child pornography.  Because defendant showed an interest in sharing child pornography and mentioned child pornography websites and chatrooms, this conversation purportedly suggests that defendant had experience sharing child pornography online.  Additionally, defendant's statement "oh that's . . . child pornography" suggests that he knew that the CD contained child pornography.

Balancing the probative value of this portion of the transcript against the danger that it will lead to unfair prejudice, the Court finds that exclusion of the evidence pursuant to Rule 403 is warranted.  As the Court noted above, when considering the probative value of evidence under Rule 403, the Court must consider the entire evidentiary context of the case, not just the evidence viewed in isolation.  Old Chief, 519 U.S. at 182 – 184; see also Awadallah, 436 F.3d at 132.  Here, the evidentiary context for this transcript is discussed in the Court's prior order admitting child pornography found on defendant's computer.  There, the Court found that the government had "ample proof" that defendant had knowledge of and access to the child pornography found on his computer.  Dkt. #237 19 – 20.  In fact, the government even recovered evidence from defendant's computer showing that he played the child pornography videos stored on his hard drive. Id. at 22.  Consequently, there is already a substantial amount of evidence in this case tending to show that defendant possessed child pornography, knew that he possessed it, and viewed it.  Therefore, considered in the full evidentiary context of this case, the portions of the transcript discussed above have limited probative value.  At best, this evidence shows that defendant knowingly possessed child pornography and transferred it to Veth, and because the government already plans to admit other evidence demonstrating

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CRIMINAL MINUTES - GENERAL

defendant's knowledge of and access to child pornography, this additional proffer is cumulative and entitled to little evidentiary weight.

Moreover, turning to the unfair prejudice aspect of the Rule 403 analysis, this evidence carries a substantial danger of unfair prejudice. Like the evidence of encryption, the statements made by defendant in the portion of the transcript proffered by the government support an inference that defendant has a morally repugnant character. In particular, the callous manner in which defendant talks about child pornography in the transcript ("Oh that's fucking child pornography") supports an inference that defendant lacks empathy for the subjects of the pornography and sensitivity to the moral and social norms underlying the condemnation of child pornography. While defendant's possession and viewing of child pornography alone could lead to the jury to infer that defendant has this character trait, this inference is substantially reinforced by the hardened and indifferent manner in which defendant discusses child pornography in the transcript. Accordingly, there is a significant danger that if this evidence is admitted, the jury will seek to punish defendant because they believe he is a bad person deserving of punishment, particularly in light of the fact that child pornography evidence is uniquely inflammatory. Carillo, 981 F.2d at 774; Loughry, 660 F.3d at 972; Cunningham, 694 F.3d at 390 – 391. Additionally, even putting aside the risk of a conviction on an improper basis, this sort of inflammatory evidence diverts the jury's attention from the material issues. United States v. Fawbush, 634 F.3d 420, 423 (8th Cir. 1990). Accordingly, this evidence should be excluded pursuant to Rule 403.

The risk of an improper conviction based on defendant's bad character therefore provides a sufficient basis upon which to exclude this evidence, but additional considerations point to another serious risk of unfair prejudice. This distinct risk of unfair prejudice arises because the portion of the transcript the government seeks to admit suggests that defendant has engaged in uncharged but serious misconduct, namely, distributing child pornography on the Internet. Due to the reprehensible nature of this conduct, it is possible that the jury might convict defendant in order to punish him for this conduct, even if the jury doubts whether defendant engaged in the charged conduct. See, e.g., The New Wigmore: A Treatise on Evidence: Evidence of Other Misconduct and Similar Events, § 1.3 n.6 (one form of unfair prejudice is risk that jury will punish defendant for uncharged misconduct); United States v. Brooke, 4 F.3d 1480, 1487 (9th Cir. 1993) ("Lying about having cancer is a particularly egregious violation of social convention, likely to provoke an instinct to punish separate and apart from any relation of the fraud to the elements of the charged crimes."). While other evidence in this case shows that defendant knowingly possessed and accessed child pornography, there is no evidence suggesting that he distributed it online, nor any explanation regarding why this fact is relevant, so the transcript introduces a new and significant risk of unfair prejudice not created by other evidence.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CRIMINAL MINUTES - GENERAL

The Court therefore agrees with defendant that the transcript has limited probative value, and that this probative value is substantially outweighed by the risk of unfair prejudice. Accordingly, this evidence should be excluded pursuant to Rule 403.

## VI. DEFENDANT'S MOTION TO EXCLUDE EXPERT WITNESSES

### A. Background and Summary of Proposed Testimony

#### 1. Testimony of Dr. Freed

Dr. Freed, M.D., is a psychiatrist and associate clinical professor of psychiatry at the University of Southern California. Dkt. #303 Ex. G. She is certified by the American Board of Psychiatry and Neurology. Dkt. #303 Ex. A. Dr. Freed specializes in child and adolescent trauma, and has studied the psychological trauma suffered by victims of trafficking and sexual exploitation in Cambodia. Id. Dr. Freed has traveled to Cambodia several times over the past 15 years, and has studied, written about, and lectured on various aspects of commercial sex in Cambodia. Id.

The government seeks to introduce testimony from Dr. Freed about general aspects of Vietnamese and Khmer culture and society. This testimony will discuss a broad range of issues, including the relationship between parents and children, the extent to which these cultures place a value on "individualism," cultural values surrounding virginity, and the degree of shame and stigma associated with sexual abuse and sexual violence. Dkt. #303 Ex. A at 3. Additionally, Dr. Freed will testify regarding the reasons girls enter prostitution or continue working as prostitutes. Specifically, Dr. Freed will testify that families, and mothers in particular, get angry with their daughters if they will not work as a prostitute, and that girls will often continue to work as prostitutes due to a sense of duty to their families.

Other aspects of her testimony will focus specifically on cultural and sociological facts about the Svay Pak area. For instance, Dr. Freed will testify that in Svay Pak, "from the time a girl is very young, she is taught that her value lies in one day engaging in prostitution and providing financially for her family. These girls are brought up knowing that this is their future and that this is their only value." Dkt. #303 Ex. A at 2. Additionally, Dr. Freed will testify that mothers and other family members often introduce children into prostitution. Id.

Additionally, the government seeks to have Dr. Freed testify regarding the mental state and psychological profile of Cambodian or Vietnamese girls who work as prostitutes or have been sexually violated in some other way. In particular, Dr. Freed will explain that "[g]irls who have been sexually violated because of the involvement of family members or acquaintances feel a

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CRIMINAL MINUTES - GENERAL**

deep sense of betrayal of trust." Dkt. #303 Ex. A at 4. Dr. Freed will also testify regarding "adaptive behaviors" that victims utilize to insure "physical and emotional survival." Id. These behaviors include "being submissive, sweet, and compliant." Id. Finally, Dr. Freed will testify about the "psychological meaning" of the "distortions, historical inaccuracies, and ambiguities that are part of a girl's accounts of her time as a prostituted child." Id.

2.    Testimony of Dr. Collins

Dr. Collins is a psychiatrist and Associate Professor in the Department of Psychiatry at the University of Toronto. Dkt. #303 Ex. D. at 1. Dr. Collins' testimony will provide information on mental disorders known as "paraphilias." Dkt. #303 Ex. D. at 1. Dr. Collins' report states that a diagnosis of paraphilia is appropriate where an individual exhibits " (a) recurrent and intense sexual fantasies, urges, or behaviors directed toward body parts or nonhuman objects; suffering or humiliation of either partner in a sexual situation; or sexual activity with a non-consenting person and (b) that these fantasies, urges and behaviors cause clinically significant distress or impairment in functioning." Id. Dr. Collins' testimony will also focus on a particular paraphilia called "partialism," which exists where an individual is sexually attracted to a part of the body not typically thought to be an erogenous zone. Dkt. #303 Ex. D at 2. Dr. Collins will explain to the jury that "[p]artialism can also be associated with paraphilic stalking which involves following the victim in order to view, photograph or video record the part of the body that the individual is erotically attracted to." Id.

In addition to providing this general psychological testimony, Dr. Collins will testify about the numerous images found on defendant's digital media that depict the feet and legs of prepubescent girls. Dkt. #303 Ex. B. This testimony will explain that this vast collection of pictures suggests that defendant is sexually attracted to the feet and legs of prepubescent girls, and that this attraction is "recurrent and intense." Dr. Collins will also testify that possession of this collection is consistent with "paraphilic stalking," which is stalking associated with a sexual interest in the person being followed.

Although Dr. Collins will provide information about the diagnosis of "partialism," and will state that defendants' collection of images suggests that he is sexually attracted to the feet and legs of prepubescent girls, the government maintains that Dr. Collins will not explicitly "diagnose" defendant with partialism or another paraphilia.

**B.    Legal Standard for Admissibility of Expert Testimony**

Federal Rule of Evidence 702 controls the admissibility of testimony by expert witnesses, and provides:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

○

**CRIMINAL MINUTES - GENERAL**

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Under this rule, a trial judge acts as a "gatekeeper" to insure that expert testimony "is not only relevant, but reliable."  Daubert v. Merrel Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993).  A trial judge executes this "gatekeeper" role whether expert testimony is scientific or non-scientific, with the purpose of ensuring that "an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999).

The Supreme Court in Daubert enumerated a list of factors useful for evaluating the reliability of a scientific expert, and trial courts have broad discretion to determine whether these factors are "reasonable measures of reliability" for evaluating non-scientific testimony. Kuhmo Tire, 526 at 153.[9]  In exercising this broad discretion, "not only must the trial court be given broad discretion to decide whether to admit expert testimony, it must have the same kind of latitude in deciding how to test an expert's reliability."  United States v. Hankey, 203 F.3d 1160, 1168 (9th Cir. 2000).  When an expert's testimony is not scientific or technical, the reliability of that testimony need not be based on "a particular methodology or technical framework," but instead can be found reliable based on the expert's knowledge and experience alone.  Hangarter v. Provident Life and Acc. Ins. Co., 373 F.3d 998, 1018 (9th Cir. 2004).

----

[9] The non-exhaustive list of factors enumerated in Daubert include "(1) whether the scientific theory or technique can be (and has been) tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) whether there is a known or potential error rate, and (4) whether the theory or technique is generally accepted in the relevant scientific community."  Mukhtar v. California State University, Hayward, 299 F.3d 1053, 1064 (9th Cir. 2002)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

○

**CRIMINAL MINUTES - GENERAL**

In addition to evaluating an expert's reliability, a trial court must also determine whether an expert has "appropriate qualifications – i.e., some special knowledge, skill, experience, training or education." Hankey, 203 F.3d at 1168. "Rule 702 contemplates a broad conception of expert qualifications." Hangarter, 373 F.3d at 1015. Nonetheless, there are limitations on when an individual qualifies as an expert in a particular field. In particular, the fact that an expert is qualified in a particular field or discipline does not automatically qualify that expert in related disciplines. Wilson v. Woods, 163 F.3d 935, 937 (5th Cir. 1999) (expert qualified to testify regarding fire reconstruction and investigation not qualified to testify on automobile accident reconstruction).

### C.   Admissibility of Dr. Freed's Testimony

The government offers Dr. Freed's testimony for two primary purposes. First, the government seeks to explain to the jury the "cultural factors" behind the child sex trade in Cambodia ("cultural context testimony"). In particular, the government intends to introduce Dr. Freed's testimony to give the jury a cultural context for understanding "why a child would perform sex acts on strangers, repeatedly, rather than run away; why a child would acquiesce, rather than fight; why a parent would not only not stop, but facilitate, this activity; why a child would not immediately and fully disclose." Mot. at 17. Second, the government seeks to introduce this testimony to explain how being sold for sex psychologically impacts a Cambodian child's ability to provide a coherent story explaining her experiences as a child prostitute.

The government argues that Dr. Freed's testimony is relevant because it will provide background information that will help the jury understand the victims' testimony and the social and cultural context in which the alleged crimes were committed. The government points out that this use of expert testimony is allowed by Rule 702, which permits expert testimony to be used to educate the jury regarding "general principles" as long as the testimony fits the facts of the case. Fed. R. Evid. 702 Advisory Committee Notes, 2000 Amendments. The government also points out that courts have allowed similar expert testimony to explain general principles about criminal practice and methodology, and that the Ninth Circuit has approved the use of cultural context testimony. See, e.g., United States v. Brooks, 610 F.3d 1186, 1196 (9th Cir. 2010) (finding that expert testimony about "the business of prostitution and the relationships between pimps and prostitutes" was relevant because "[b]y and large, the relationship between prostitutes and pimps is not the subject of common knowledge."); Dang Vang v. Vang Xiong X. Toyed, 944 F.2d 476 (9th Cir. 1991) (approving of cultural context testimony about the Hmong refugee community).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CRIMINAL MINUTES - GENERAL**

The government argues that Dr. Freed is qualified to provide this testimony because she is a board certified psychiatrist who specializes in child and adolescent trauma, and has traveled to Cambodia "numerous times" over the past seventeen years to study the commercial sex trade and child prostitution. Additionally, she has provided treatment in the United States to refugees from Southeast Asia. These experiences traveling to Cambodia and treating former child prostitutes purportedly qualifies Dr. Freed to provide both the cultural context testimony and testimony about the psychological profile of former child prostitutes. See Kumho Tire, 526 U.S. at 156 ("no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience").

Defendant raises several arguments in response. First, defendant claims that the government has not proven that Dr. Freed's experience in Cambodia qualifies her to provide relevant expert testimony in this case. Defendant points out that it is unclear how many times Dr. Freed has been to Cambodia to conduct research, and therefore requests a hearing to addressing her qualifications. Second, defendant argues that Dr. Freed's research methods rely too heavily on personal interviews with former child prostitutes, and that the number of interviews conducted by Dr. Freed (twelve) was too small to justify general conclusions applicable to all former child prostitutes. Defendant further argues that the conclusions reached in the personal interviews are too vague to corroborate, and are therefore unreliable. Third, defendant argues that because Dr. Freed seeks to testify that emotional trauma will lead child prostitutes to tell inconsistent stories about their background to hide their shame, it is an impermissible attempt to buttress the victims' testimony. United States v. Candoli, 870 F.2d 496, 506 (9th Cir. 1989) ("An expert witness is not permitted to testify specifically to a witness' credibility or to testify in such a manner as to improperly buttress a witness' credibility."). Defendant contends that because "[a] fundamental premise of our criminal trial system is that the *jury* is the lie detector," an expert witness should not be permitted to tell the jury that a witness's inconsistent statements are not a reason to doubt her credibility. See United States v. Scheffer, 523 U.S. 303, 313 (1998).

The Court analyzes Dr. Freed's qualifications, reliability, and the relevance of her testimony in turn. First, turning to qualifications, the Court finds that Dr. Freed is qualified to offer psychological testimony about the emotional trauma suffered by child prostitutes. Dr. Freed has substantial training and practical experience in psychiatry, and has conducted clinical and research work with former Cambodian child prostitutes and their families. This training and experience qualifies Dr. Freed to offer testimony about the emotional and mental state of former child prostitutes from Cambodia.

Dr. Freed is not, however, qualified to provide general testimony about Khmer and Vietnamese culture. Although Dr. Freed is a trained psychiatrist, there is no evidence that she is

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

○

**CRIMINAL MINUTES - GENERAL**

"a trained sociologist or anthropologist, academic disciplines that *might* qualify one to provide reliable information about the cultural traits and behavior patterns of a particular group of people of a given ethnicity or nationality." Jinro America Inc. v. Secure Investments, Inc., 266 F.3d 993, 1006 (9th Cir. 2001) (emphasis in original). Without training in these disciplines, it appears that her claims about Khmer and Vietnamese culture are not based in specialized experience refined by training or expertise, and are therefore not distinguishable from "impressionistic generalizations" based on nothing more than personal experience. Id. This is not to say that valid anthropological testimony cannot be based on personal experience. See Reliable Evaluation of Expert Testimony, 116 Harv. L. Rev. 2142, 2159 (2003) ("Anthropological expertise is characterized by the witness's reliance solely on personal experiences as a member or observer of a particular community to testify about its practices, beliefs, or conventions."). But Dr. Freed did not travel to Cambodia in order to draw general conclusions about South East Asian culture based on her personal experience, but instead traveled there to engage in psychiatric study about child and adolescent trauma. Dr. Freed's experiences traveling to Cambodia, therefore, do not qualify her as an expert in Khmer and Vietnamese culture. See The New Wigmore: A Treatise on Evidence: Expert Evidence, § 10.3.4 Knowledge of Other Cultures or Groups (courts should consider whether an individual with exposure to a culture or group "knows enough to translate these experiences into reliable observational knowledge appropriate to the particular case and is drawing on this knowledge in a suitable fashion."); Recreational Developments of Phoenix, Inc. v. City of Phoenix, 220 F. Supp. 2d 1054, 1062 (D. Ariz. 2002) (investigative journalist not qualified to testify as an expert on "swinger culture" based on his research conducted for a book on the lifestyle of swingers); Kumho Tire, 526 U.S. at 149 (expert's knowledge and experience must be in the "relevant discipline").

While the government rightfully points out that "Rule 702 contemplates a broad conception of expert qualifications," Hangarter, 373 F.3d at 1015, special care should be taken to only allow cultural context testimony from qualified experts, because this form of testimony introduces the unique risk of reinforcing or appealing to harmful, negative, or inaccurate ethnic stereotypes. See Nancy S. Kim, The Cultural Defense and the Problem of Cultural Preemption: A Framework for Analysis, 27 N.M. L. Rev. 101, 124 – 125 (1997); Jinro America Inc., 266 F.3d at 1006 (excluding testimony that "culturally stereotyped Korean businesses"). This risk is particularly strong where proffered testimony seeks to address general characteristics of a culture, because "it is nearly impossible to state with accuracy the mindset of every person who comes from a certain culture." Taryn F. Goldstein, Cultural Conflicts in Court: Should the American Criminal Justice System Formally Recognize a "Cultural Defense"?, 99 Dick. L. Rev. 141, 166 (1994). Even experts with training in a relevant social science can offer testimony that reinforces "outdated patriarchal and racist stereotypes." Kim, 27 N.M. L. Rev. at 124 – 125 (discussing the use of expert testimony in People v. Chen, No. 87-7774 (N.Y. Sup. Ct. Mar. 21,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CRIMINAL MINUTES - GENERAL

1989)); see also Goldstein, 99 Dick. L. Rev. at 165 (noting that in People v. Chen, the expert anthropologist testified that "adultery makes Chinese men more prone to violence" and was criticized by Chinese cultural organizations for expounding "archaic" thinking about Chinese culture).  Insuring that an expert has relevant qualifications mitigates the risk that cultural context testimony will amount to cultural stereotyping.

The Court next considers the reliability of Dr. Freed's psychological testimony about the impact of working as a prostitute on a child's mental and emotional state.  Here, the depth of Dr. Freed's experience in psychiatry working with child and adolescent victims of trauma, and her extensive publications and lectures on the subject, demonstrate sufficient expertise to support a finding that her testimony is reliable.  While defendant points out that her conclusions are based on a limited number of interviews, "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion on cross-examination."  Children's Broad. Corp. v. Walt Disney Co., 357 F.3d 860, 865 (8th Cir. 2004); See also Hangarter v. Provident Life and Acc. Ins. Co., 373 F.3d 998, 1017 fn. 14 (9th Cir. 2004) (following Children's Broad. Corp).

Finally, the Court considers the relevance of Dr. Freed's testimony and whether it improperly usurps the jury's factfinding role.  The government cites several Ninth Circuit decisions explaining when it is appropriate to admit clinical or psychological testimony concerning how to assess a child victim's allegations of sexual abuse.  United States v. Lukahov, 694 F.3d 1107, 1116 – 1117 (9th Cir. 2012); United States v. Hadley, 918 F.2d 848 (9th Cir. 1990); United States v. Antone, 981 F.2d 1059 (9th Cir. 1992); United States v. Binder, 769 F.2d 595 (9th Cir. 1985).  These cases allow an expert to provide testimony about "general behavioral characteristics exhibited by victims of child sexual abuse," Antone, 981 F.2d at 1062, and even allow an expert to state that her medical findings and observations of a victim are "consistent" with allegations of sexual abuse, Lukashov, 694 F.3d at 1116 – 1117.  An expert cannot, however, comment on a particular witness's credibility, and cannot state a diagnosis of child sexual abuse to a jury.  Id. at 1117; see also Binder, 769 F.2d 602 (impermissible for expert to say that particular victims could distinguish fantasy from reality because the consequence of this testimony was that "[t]he jury in effect was impermissibly being asked to accept an expert's determination that these particular witnesses were truthful.").

Here, the government does not seek to have Dr. Freed comment on the testimony, allegations, or experiences of any of the victims.  Instead, her testimony only seeks to address the general psychological characteristics possessed by victims of child prostitution in Cambodia.  Accordingly, this testimony is relevant, and does not improperly encroach upon the jury's role as the factfinder.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

○

**CRIMINAL MINUTES - GENERAL**

**D.   Dr. Collins**

The government argues that Dr. Collins' expert testimony satisfies Federal Rule of
Evidence 702 because it will educate the jury regarding paraphilia and partialism, which will
assist the jury in understanding the digital media evidence depicting images of prepubescent
girls' feet and legs.  Fed. R. Evid. 702 (expert testimony is proper if it "will help the trier of fact
to understand the evidence").  Specifically, through Dr. Collins testimony, the government will
establish that although these images are not typically understood to be erotica, from the
perspective of an individual diagnosed with partialism, these images in essence are a form of
erotica.

Defendant does not object to Dr. Collins qualifications, but instead argues that Dr. Collins'
testimony constitutes impermissible propensity evidence and is otherwise not relevant.
Defendant argues that Dr. Collins' testimony is not relevant because the "sheer volume" of the
collection itself tends to show that defendant had an erotic obsession with these pictures.
Defendant also notes that the Court's prior order found that the photographs, by themselves,
were probative of defendants abnormal sexual attraction to children, and hence that expert
testimony is unnecessary to explain these photographs.  See Dkt. #237 at 27.  Finally, defendant
explains that this testimony amounts to propensity evidence because it is being introduced to
establish that defendant was sexually attracted to prepubescent girls for the purpose of showing
that he acted on these urges on particular occasions.[10]

The Court finds that Dr. Collins' testimony satisfies Rule 702 because it will help the jury
understand the pictures of feet and legs found on defendant's computer.  United States v. Cross,
928 F.2d 1030, 1049 (11th Cir. 1991) ("A properly qualified expert witness may testify
regarding his specialized knowledge in a given field if it would assist the trier of fact to
understand the evidence or to determine a fact in issue.").  While it may be true that jury could
conclude based on the sheer volume and the content of these pictures that defendant had an
erotic obsession with the feet and legs of prepubescent girls, this inference is not obvious.  The
jury might understand the significance of the photographs without Dr. Collins' testimony, but
this fact alone does not render his testimony inadmissible.  After all, Rule 702 only requires that
expert testimony "help" the trier of fact understand the evidence; expert testimony need not be
necessary for understanding other evidence.  Moreover, courts have held that expert testimony

---

[10] Defendant's original motion also argued that several of Dr. Collins' conclusions were
not reliable.  In response, however, the government has limited the subjects upon which Dr.
Collins' will testify, mooting several of the arguments in defendant's opening brief.  See Govt.
Opp. at 6 (explaining the matters upon which Dr. Collins will not testify).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

○

**CRIMINAL MINUTES - GENERAL**

is admissible to assist the jury in understanding the obscenity or prurient appeal of particular images. Cross, 928 F.2d at 1050 – 1051. Accordingly, Dr. Collins' testimony is proper under Rule 702.

The government states that it does not intend to have Dr. Collins diagnose defendant with partialism. This limitation is necessary: expert testimony must be "based on sufficient facts or data," and because Dr. Collins has not examined defendant, any diagnose of partialism would lack adequate factual foundation. Fed. R. Evid. 702 – 703. Accordingly, Dr. Collins may opine that the collection of images found on defendant's computer is consistent with partialism, but may not opine that defendant, as the owner of the collection, can be diagnosed with partialism.

In addition to meeting the requirements of Rule 702, Dr. Collins' testimony must also meet the requirements of Rule 403. Daubert, 509 U.S. 595. Because Dr. Collins' testimony does not diagnose defendant with partialism, Rule 403 is easily satisfied. As explained above, Dr. Collins' testimony has probative value because it assists the jury in understanding the photographs of feet and legs recovered from defendant's computer. Moreover, this testimony does not present a substantial danger of unfair prejudice because it only provides background information about a psychiatric diagnosis and explains the pictures found on defendant's computer. Because Dr. Collins' will not actually diagnose defendant with partialism, there is no danger of unfair prejudice arising out of an unfounded diagnosis or a disparaging claim about defendant's character. Moreover, unlike the evidence related to child pornography discussed above, Dr. Collins' testimony and the pictures that are the subject of his testimony are not so inflammatory that they create a risk that the jury will render a conviction to punish defendant for uncharged conduct or a bad character. Dr. Collins' testimony is therefore admissible under Rule 403.

## VI. GOVERNMENT'S MOTION TO PRECLUDE IMPROPER IMPEACHMENT

### A. Background

The government seeks to introduce testimony from a cooperating witness, referred to as CW-1. CW-1 is a jailhouse informant, and in 2010, CW-1 pled guilty to federal narcotics and firearms charges.[11] These charges arose out CW-1's attempts to purchase a kilogram of cocaine

---

[11] Specifically, CW-1 pled guilty to a three count indictment charging (1) Conspiracy to Possess with Intent to Distribute Cocaine (21 U.S.C. § § 846, 841(a)(1), (b)(1)(B)(ii)); (2) Possession of a Firearm in Furtherance of a Drug Trafficking Crime (18 U.S.C. § 924(c)); and (3) Felon in Possession of Firearm and Ammunition (18 U.S.C. § 924(c)).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CRIMINAL MINUTES - GENERAL**

from a drug supplier known as "El Colombiano" in early 2008. During this transaction, CW-1 met El Colombiano to purchase a kilogram of cocaine, but the deal went awry because CW-1 believed that the substance he was given was not actually cocaine. CW-1 then pursued El Colombiano with a loaded gun and fired at least one round at him. After hearing the gunshots, the police found CW-1 and he was arrested.

While CW-1 was in custody on the federal charges, he attempted to befriend inmates in order to obtain information against them for use in a plea bargain. As CW-1 explained his behavior, "I started to be nice, so I can get info." CW-1 took notes on his conversations with other inmates, and labeled his notes "4 Lawyer or Feds."

Defendant met CW-1 because they were incarcerated in the same cellblock for eight months, and the two spoke on several occasions. Defendant purportedly discussed several topics with CW-1, including his legal strategy in this case, his belief that he is a Cambodian citizen, the fact that he is attracted to small prepubescent girls, and his confusion regarding why child pornography and sex with children is not acceptable in the United States.

Pursuant to a plea bargain, CW-1 has agreed to testify against defendant concerning these conversations. CW-1's sentencing hearing has been postponed at the government's request until this case has concluded, and pursuant to the terms of the agreement between the government and CW-1, the government has agreed to file a motion for a downward departure if CW-1 provides substantial assistance.

CW-1 has provided testimony pursuant to a plea bargain in the past. In 2006, CW-1 pled guilty to acting as an accessory to murder, and was sentenced to twenty-six days in jail and 60 months probation. These charges arose from a shooting that took place on July 3, 2005. That night, CW-1 was driving in a Chevy Tahoe with his friends, and while stopped at a gas station, he began arguing with the occupants of another car. During this argument, two people were shot. One victim died at the scene and the other died shortly afterwards in the hospital.

Detectives eventually identified defendant as the owner and driver of the Tahoe, and on November 12, 2005, they went to CW-1's residence. After seeing the Tahoe, the officers arrested and interviewed CW-1. CW-1 admitted to being the driver of the Tahoe that night and stated that his friend Michael Trylich was also present during the shooting. He repeatedly denied knowing the identity of the shooter. CW-1 agreed to take a polygraph test to test the veracity of his claims, but the results stated that his answers were deceptive. Based on CW-1's statements, police located Michael Trylich and arrested him for his involvement in the murder.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

○

**CRIMINAL MINUTES - GENERAL**

CW-1 was initially charged with two counts of murder and one count of accessory to murder, and faced life imprisonment if convicted.  Shortly after being indicted, however, CW-1 agreed to cooperate with the government and testify that Shawn Munoz had been the shooter. In connection with this agreement, CW-1 admitted that he had lied about Michael Trylich being present in the car during the night of the murders.  CW-1 was sentenced to time served (twenty-six days) and sixty months probation.

CW-1 testified during Munoz' trial in November 2009.  During his testimony, CW-1 initially invoked his Fifth Amendment rights and refused to answer any questions related to his federal charges, to which he had not yet pled guilty.  Eventually, he was given use immunity by state and federal prosecutors, and testified against Munoz.  The jury deliberated for an hour in the Munoz trial and returned a verdict of not guilty.[12]

**B.   Analysis**

The government's motion in limine seeks to limit the scope of defendant's cross-examination of CW-1, and in particular seeks to limit the extent to which defendant probes CW-1's criminal history and history as a cooperating witness.  As a general matter, the parties agree that these topics are appropriate subjects for cross examination because CW-1's criminal background is relevant to his character for truthfulness, and the details regarding the benefits he will receive from cooperating with the government are relevant to his bias in favor of the government.  The parties disagree, however, regarding what details of CW-1's background are relevant to his bias and character for truthfulness.

According to the government, the following facts about CW-1's criminal history and history as a cooperating witness can be elicited from CW-1 on cross examination:

- CW-1 sustained an adult felony conviction in 2006 for "accessory to murder after the fact."   CW-1's sentence was 26 days time served and five years of supervised probation.

- CW-1 was also initially charged with two counts of murder but entered into a time-served plea agreement in which he agreed to cooperate against Shawn Munoz in exchange for the dismissal of the murder counts

---

[12] The government's motion also seeks to prohibit defendant from cross-examining Isaac Veth regarding a funeral he held for an infant in Cambodia.  There appears to be no opposition to this motion from defendant.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CRIMINAL MINUTES - GENERAL**

- CW-1 initially told police that Michael Trylich was in the SUV on the night of the shooting; he later told police and testified that Paul Munoz and Shawn Munoz were in the SUV and Trylich was not

- CW-1 initially denied knowing the identity of the shooter, but later told police and testified that Shawn Munoz was the shooter

- Trylich was arrested after CW-1 said Trylich was in CW-1's SUV on the night of the shooting

- CW-1 was facing life imprisonment on the murder charges prior to signing an immunity agreement and testifying against Shawn Munoz

- CW-1 testified during the Munoz trial with use immunity from the United States Attorney's Office

- CW-1 testified during the Munoz trial with use immunity from the District Attorney for his probation violation

- CW-1 sustained an adult felony conviction in 2010 for (1) conspiracy to possess with intent to distribute cocaine (2) discharging a gun in connection with the drug charge and (3) felon in possession of a firearm

- The terms of CW-1's federal plea agreement

- CW-1 befriended inmates in San Bernardino for the purpose of cooperating.  CW-1 said "I started to be nice, so I can get info."  CW-1 took contemporaneous notes of his conversations with defendant, which CW-1 labeled "4 Lawyer or Feds." CW-1 obtained information on defendants other than defendant while in custody
- CW-1 has not yet been sentenced on his federal charges and his sentencing hearing has been continued at the government's request until his cooperation has concluded

Other facts about CW-1's history are not, according to the government, appropriate subjects for cross examination because they are cumulative, not relevant to bias, and not relevant to CW-1's character for truthfulness.

In response, defendant argues that there are two additional appropriate areas of cross-examination.  First, defendant argues that he may also cross-examine CW-1 regarding instances

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

○

**CRIMINAL MINUTES - GENERAL**

during which he was arrested for conduct unrelated to his 2005 and 2010 guilty pleas. Defendant argues that these arrests are relevant because they are factors that can be taken into account for determining the length of the sentence CW-1 will receive pursuant to his federal guilty plea. Consequently, defendant explains, they are relevant to prove the length of the sentence that CW-1 would face due to his guilty plea, and hence are relevant to demonstrating the magnitude of his motive for testifying in a manner that pleases the government. Second, defendant argues that he may cross-examine CW-1 regarding any of the details concerning the criminal activity underlying CW-1's 2010 guilty plea. Again, defendant argues that these details are relevant to CW-1's bias because they show what criminal conduct CW-1 would have been charged with had he not pled guilty, and therefore demonstrate the magnitude of the benefit he stands to gain from his plea bargain, which in turn shows the magnitude of his motive to testify in a manner favorable to the government.

Defendant's right to cross-examine CW-1 regarding his character for truthful is set out in Federal Rules of Evidence 608 and 609, which provide:

> Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of:
>
> > (1) the witness; or
> >
> > (2) another witness whose character the witness being cross-examined has testified about.
>
> The following rules apply to attacking a witness's character for truthfulness by evidence of a criminal conviction:
>
> > (1) for a crime that, in the convicting jurisdiction, was punishable by death or by imprisonment for more than one year, the evidence:
> >
> > > (A) must be admitted, subject to Rule 403, in a civil case or in a criminal case in which the witness is not a defendant

Fed. R. Evid. 608, 609. Pursuant to these rules, CW-1's criminal convictions are admissible, and CW-1's specific acts of dishonesty related to those convictions – for example the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

○

**CRIMINAL MINUTES - GENERAL**

inconsistent statements to the police concerning who was present during the shooting – can be inquired into on cross examination.[13]

Defendant's right to cross-examine CW-1 for bias is protected by the Sixth Amendment's confrontation clause, which provides that "the accused shall enjoy the right . . . to be confronted with the witnesses against him." Under this right, "the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness." Davis v. Alaska, 415 U.S. 308, 316 (1974). Moreover, "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." Id. at 317. Nonetheless, a trial court has "broad discretion" to limit the scope of cross-examination "to preclude repetitive and unduly harassing interrogation." Id. at 316. To determine whether a limitation on cross-examination is consistent with the Sixth Amendment, the Ninth Circuit has instructed courts to consider (1) whether the limitation excludes relevant evidence, (2) whether other legitimate interests outweigh the defendant's interest in presenting the evidence, and (3) whether excluding the evidence leaves the jury with sufficient information to assess the credibility of the witness. United States v. Beardslee, 197 F.3d 378, 383 (9th Cir. 1999).

The right to cross-examine witnesses has special significance where the government seeks to introduce testimony from a criminal informant. As the Ninth Circuit has explained, "[t]he use of informants to investigate and prosecute persons engaged in clandestine criminal activity is fraught with peril." United States v. Bernal-Obeso, 989 F.2d 331, 333 (9th Cir. 1993). Criminal informers must be "carefully watched by . . . the courts to prevent them from falsely accusing the innocent, manufacturing evidence against those under suspicion of crime, and from lying under oath in the courtroom." Id. In particular, "[t]he most dangerous informer of all is the jailhouse snitch who claims another prisoner has confessed to him. The snitch now stands ready to testify in return for some consideration in his own case. Sometimes these snitches tell the truth, but more often they invent testimony and stray details out of the air." Maxwell v. Roe, 628 F.3d 486, 505 (9th Cir. 2010) (quoting Stephen S. Trott, Words of Warning for Prosecutors Using Criminals As Witnesses, 47 Hastings L.J. 1381, 1394 (1996)). Because "[s]ome of these informants will stop at nothing to maneuver themselves into a position where they have something to sell," Bernal-Obeso, 989 F.2d at 334, a criminal

---

[13] As the government points out, however, the fact that CW-1 failed a polygraph test is not admissible evidence because "a polygraph test is inadmissible to show . . . veracity." Cooper v. Brown, 510 F.3d 870, 945 (9th Cir. 2007).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CRIMINAL MINUTES - GENERAL**

defendant must be able to effectively cross-examine these witnesses to fully explore their bias in favor of the government.

Accordingly, a defendant must be allowed to cross-examine a cooperating witness regarding the anticipated benefit that witness will receive for testifying in a manner favorable to the government. United States v. Schoneberg, 396 F.3d 1036, 1042 (9th Cir. 2005) ("Where a plea agreement allows for some benefit or detriment to flow to a witness as a result of his testimony, the defendant must be permitted to cross-examine the witness sufficiently to make clear to the jury what benefit or detriment will flow, and what will trigger the benefit or detriment, to show why the witness might testify falsely in order to gain the benefit or avoid the detriment."). In the course of this cross-examination, a defendant must be allowed to elicit not only the fact that the witness will receive a benefit, but the witness's subjective understanding of the magnitude of that benefit. United States v. Larson, 495 F.3d 1094, 1105 – 1106 (9th Cir. 2007); United States v. Chandler, 326 F.3d 210, 222 (3d Cir. 2003).

Applying these principles, the Court finds that it is reasonable to prevent defendant from cross-examining CW-1 regarding arrests unrelated to his 2005 and 2010 guilty pleas. These arrests are potentially relevant to the length of CW-1's sentence, because they might be included in the presentence report's discussion of CW-1's criminal and social history, and can be considered by a sentencing court if there is a sufficient basis to conclude that any conduct alleged in related arrest reports actually occurred. United States v. Guajardo-Martinez, 635 F.3d 1056, 1059 (7th Cir. 2011); United States v. Zapete-Garcia, 447 F.3d 57, 61 (1st Cir. 2006) ("[A] series of past arrests might legitimately suggest a pattern of unlawful behavior even in the absence of any convictions . . ."). These arrests are not, however, relevant to CW-1's bias, because unlike past convictions, past arrests are not relevant to the computation of a defendant's criminal history, which coupled with defendant's offense level, informs defendant's advisory guideline range. Consequently, at most, the arrests are potentially relevant to predicting what aggravating factors could be considered by a court at the time of sentencing, not the reduction in offense level he stands to gain from testifying. The arrests are therefore not relevant, because the important fact for evaluating a cooperating witness's bias is not the total magnitude of the sentence he faces, but the difference between the offense level he would face with a motion for reduction of sentence compared to his offense level without cooperation. Therefore, any facts merely tending to show the magnitude of the sentence that a cooperating witness faces are irrelevant and could confuse the jury.

In contrast, the facts underlying the federal offenses to which CW-1 pled guilty in 2010 are relevant to CW-1's bias. This is the case because a cooperating witness can receive a reduced sentence in consideration for testimony in at least two ways. First, the cooperating witness could enter into an agreement with the government providing that the government will make a

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CRIMINAL MINUTES - GENERAL**

motion for a reduced sentence if it finds that the cooperating witness provided substantial assistance. Here, CW-1 and the government have entered into such an agreement, and the parties agree that it is an acceptable subject of cross-examination.

Second, a cooperating witness can also receive a reduced sentence from the government if the government elects to charge the witness with a comparatively lesser offense than what is potentially warranted by the facts underlying the witness's crime. This set of circumstances was before the Third Circuit in United States v. Chandler, 326 F.3d 210, 222 (3d Cir. 2003). There, the jury was informed that a cooperating witness pled guilty to an offense carrying a sentence between twelve and eighteen months, but that pursuant to the witness's plea agreement, the government had filed a motion requesting reduction of his sentence, with the result that the witness only received probation and one month of house arrest. Id. Additionally, the cooperating witness informed the jury that while he pled guilty to selling three ounces of cocaine, he actually sold roughly five kilograms of cocaine and acknowledged that he could have been charged with trafficking in this larger quantity of narcotics. Id. at 217, 222. Defendant was not, however, allowed to question the witness regarding the reduced sentencing range he faced due to the government's decision not to charge him with distributing roughly five kilograms of cocaine, even though this difference "might have meant the difference between more than eight years in prison." Id. at 222. The Third Circuit held that this limitation violated the Sixth Amendment because this lengthy sentence reduction "underscored dramatically [the witness's] interest in satisfying the government's expectations of their testimony." Id. at 222 – 223.

Consequently, under Chandler, a defendant may cross-examine a cooperating witness regarding both kinds of sentence reductions potentially received from the government: reductions flowing from an agreement to file a motion for a reduced sentence, and reductions flowing from the government's decision to forego charging the witness with greater offenses than those to which he pled. This remains the case even if the terms of the plea bargain between the government and the defendant do not explicitly state that defendant will be charged with a lesser offense in exchange for the informant's testimony. After all, the exchange of a lesser charged offense for testimony could have been an implicit part of a plea bargain, and even if it were not, the mere fact that the government allowed a cooperating witness to plead to a lesser charge than what is potentially warranted by the facts tends to show that a cooperating witness is biased in the government's favor, whether out of a sense of gratitude, reciprocity, or a similar sentiment.

These rules provide the guidelines concerning what limits the Court can constitutionally place upon defendant's right to cross-examine CW-1 regarding the crimes that led to his federal indictment. A complete bar restricting defendant from cross-examining CW-1 regarding the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

○

## CRIMINAL MINUTES - GENERAL

facts underlying his federal narcotics and firearms crimes would prevent defendant from demonstrating that CW-1 was allowed to plead to a lesser offense than what was potentially warranted by the evidence. Such a restriction would violate the Sixth Amendment because defendant must be allowed to cross-examine CW-1 to determine whether he was allowed to plead to a lesser offense. This rationale does not, however, allow defendant to cross-examine CW-1 about all of the details of the underlying crime. The cross-examination must focus on facts tending to show that CW-1 could have been indicted for an offense carrying a substantially greater sentence than the sentence CW-1 actually faces pursuant to his guilty plea.

## VII. CONCLUSION

In accordance with the foregoing, the parties' motions are GRANTED in part and DENIED in part. The encryption evidence is not admissible, nor are defendant's conversations with Veth concerning a CD containing child pornography. Additionally, the portion of Dr. Freed's testimony providing cultural context evidence is not admissible. However, the remainder of Dr. Freed's testimony is admissible, evidence concerning defendant's status as a sex offender is admissible, Dr. Collins' expert testimony is admissible, and the conversations between Veth and defendant were not recorded in violation of Cambodian law. Finally, cross-examination of CW-1 may proceed within the limits discussed in part VI above.

IT IS SO ORDERED.

|  | 00 | : | 00 |
|---|---|---|---|
| Initials of Deputy Clerk | | CMJ | |